Argued and submitted March 18, reversed and remanded October 29, 2008

VENTURE PROPERTIES, INC.,
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

Jeff PARKER,
*Defendant-Respondent.*

Clackamas County Circuit Court
CV04040547; A131404

195 P3d 470

Maureen Leonard argued the cause for appellant. With her on the briefs were W. Eugene Hallman and Hallman & Dretke.

Jeffrey M. Batchelor argued the cause for respondent. With him on the brief were David B. Markowitz, Charles J. Paternoster, and Markowitz, Herbold, Glade & Mehlhaf, P. C.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Plaintiff Venture Properties, Inc., (Venture) brought this action against defendant Jeff Parker, alternatively seeking damages for breach of contract or rescission of the contract. Plaintiff alleged as separate claims breach of contract, mutual mistake, intentional misrepresentation, and innocent misrepresentation. On the mutual mistake and innocent misrepresentation claims, plaintiff sought rescission; on the breach of contract and intentional misrepresentation claims, plaintiff sought damages or, alternatively, rescission. The trial court struck various allegations in the pleadings pursuant to ORCP 21 E and dismissed plaintiff's breach of contract claim for damages under ORCP 21 A(8). After plaintiff amended its pleadings to reflect the court's ORCP 21 rulings, the remaining claims proceeded to trial and, after plaintiff presented its case-in-chief, the court granted defendant's motion to dismiss the remaining claims under ORCP 54 B(2). Plaintiff appeals, challenging both of those rulings, and we conclude that the trial court erred in both respects. Accordingly, we reverse and remand.

In our analysis below of the trial court's rulings under ORCP 21 A(8) and ORCP 54 B(2), we will recount the material pleadings and evidence under the controlling standards of review. For present, introductory purposes, the following circumstances are uncontroverted: This dispute arose after defendant Jeff Parker and plaintiff Venture's owner, Don Morissette, reached an agreement by which plaintiff would buy from defendant property located in Happy Valley, Oregon, hereinafter referred to as "the property." Defendant had received approval from the City of Happy Valley to subdivide the property into 210 lots on which homes were to be built.

On January 28, 2004, the parties entered into a purchase and sale agreement for the property. That agreement contained a provision that "[t]he size, configuration or location of the Property will not be changed without the prior written consent of the Purchaser." The agreement also contained a number of specific warranties, including the following:

"vii) To the best of the Seller's knowledge, the Property is materially in compliance with applicable state and federal environmental standards and requirements affecting it.

"viii) The Seller has not received any notices [o]f violation or advisory action by regulatory agencies regarding environmental control matters or permit compliance with respect to the Property."

In the spring of 2004, plaintiff discovered that there were unresolved—and, in its view, undisclosed and material—issues concerning wetlands on the property. Those concerns led plaintiff to conclude that the property would not be able to be developed in the manner shown on the preliminary plat approval and in the time frame in which it expected to develop the property. Plaintiff, consequently, refused to go forward with the transaction. In a letter dated April 14, 2004, plaintiff informed defendant that it was rescinding the contract, and demanded return of its earnest money plus development-related costs incurred for a total of approximately $1 million. Defendant refused, and plaintiff initiated this action several days after it informed defendant that it was rescinding the contract.

Plaintiff initially sought only rescission of the contract; it later amended its pleading to also seek breach of contract damages as an alternative remedy. In particular, plaintiff's second amended complaint sought not only rescission of the contract, but alternatively sought damages including consequential damages for a total of approximately $7.5 million, either for breach of contract or for intentional misrepresentation.

Defendant moved, pursuant to ORCP 21 E, to strike the allegations in plaintiff's second amended complaint pertaining to damages as frivolous, and also moved, pursuant to ORCP 21 A(8), for dismissal of the breach of contract claim for failure to state a claim. Both of those motions were based on the same general theory: Because plaintiff had refused to go through with the sale and had informed defendant that it was rescinding the contract, plaintiff had irrevocably elected rescission as its remedy—and, given that election, plaintiff could not concurrently seek consequential damages based on

defendant's alleged breach of contract. The trial court, as described more fully below, struck numerous allegations and dismissed the breach of contract claim pursuant to ORCP 21 A(8).

The case proceeded to trial on plaintiff's remaining theories in support of rescission. Because rescission is an equitable remedy, the case was tried to the court. After plaintiff had presented its case (and the court had taken testimony from several defense witnesses out of order), defendant moved for dismissal of plaintiff's remaining claims pursuant to ORCP 54 B(2). The trial court granted defendant's motion, rendering corollary findings and conclusions. Plaintiff appeals, assigning error both to the trial court's allowance of defendant's ORCP 21 motions and to the court's dismissal with prejudice of the remaining claims under ORCP 54 B(2). We address each assignment in turn.

## I. ORCP 21 A(8) DISMISSAL OF THE BREACH OF CONTRACT (DAMAGES) CLAIM

The procedural posture of the trial court's ORCP 21 dismissal is convoluted, involving the combination of a motion to strike under ORCP 21 E[1] and a motion to dismiss under ORCP 21 A(8).[2] However, as noted, the gravamen of those motions collectively was straightforward: Plaintiff had undertaken to rescind the contract and, consequently, could not concurrently seek to recover damages for any breach. The trial court agreed:

> "I've allowed the Motion to Dismiss the First Claim of Relief for Breach of Contract. And the basis of this ruling is that the plaintiff elected to rescind the contract. And once that

---

[1] ORCP 21 E provides, in part:

"Upon motion made by a party before responding to a pleading * * * the court may order stricken: (1) any sham, frivolous, or irrelevant pleading or defense or any pleading containing more than one claim or defense not separately stated; (2) any insufficient defense or any sham, frivolous, irrelevant, or redundant matter inserted in a pleading."

[2] ORCP 21 A provides, in part:

"Every defense, in law or fact, to a claim for relief in any pleading, whether a complaint, counterclaim, cross-claim, or third party claim, shall be asserted in the responsive pleading thereto, except that the following defenses may at the option of the pleader be made by motion to dismiss: * * * (8) failure to state ultimate facts sufficient to constitute a claim[.]"

election is made, you can't have it both ways, you can't affirm and sue for damages on the contract and also seek rescission. * * * And you can't wait—the argument that you wait until judgment and then elect is not a viable argument."

Plaintiff asserts that the trial court's disposition rested on a false premise. Specifically, plaintiff contends that, as a matter of law, a party is entitled to plead in the alternative inconsistent claims or remedies, specifically including rescission and damages for breach of contract. *See Colonial Leasing Co. v. Tracy*, 276 Or 1193, 1196-97, 557 P2d 639 (1976) (when a party has multiple possible remedies, "[o]rdinarily, an election is not made until a judicial proceeding has gone to judgment on the merits"). That is, nothing in plaintiff's rescission claims as pleaded irrevocably precluded plaintiff from forgoing rescission and recovering contractual damages instead. In particular, invoking *Grider v. Turnbow*, 162 Or 622, 94 P2d 285 (1939), plaintiff argues that, although its pleadings alleged that it had notified defendant that it was rescinding the sales agreement, a rescission is not actually accomplished until either the parties agree to rescission or a rescission is established by law. Plaintiff asserts that nothing in its pleadings disclosed either of those predicates.

Defendant responds that the allegations of plaintiff's second amended complaint (as well as plaintiff's superseded complaints), taken as true, establish an irrevocable election of the remedy of rescission. In that regard, defendant points particularly to plaintiff's allegations regarding its April 14, 2004, letter to defendant that it was rescinding the agreement. Defendant cites *Bridgmon v. Walker*, 218 Or 130, 344 P2d 233 (1959), for the proposition that plaintiff's allegations of entitlement to rescission, including the allegations described in the April 14 letter, preclude pursuit of an alternative nonrescissionary remedy.

Neither *Bridgmon* nor any other authority that defendant invokes supports that conclusion. In *Bridgmon*, the Supreme Court held that the trial court had erred in denying a directed verdict against the plaintiff's breach of contract claim by which the plaintiff sought and received compensatory damages. In so holding, the court noted the

general proposition that "a vendee who has been deceived into entering into a contract of purchase may upon discovery of the fraud either affirm or rescind the contract." *Id.* at 134 (citing cases). Because the "evidence conclusively disclose[d] that the plaintiffs elected not to affirm the contract," *id.* at 135, the Supreme Court concluded that the trial court had properly allowed the motion for directed verdict. Thus, *Bridgmon* addressed the sufficiency of a plaintiff's proof in the face of a directed verdict motion against a claim for breach of contract; it did not purport to address the sufficiency of pleadings—much less whether a plaintiff's announcement of intent to rescind a contract would preclude the plaintiff from later seeking damages other than rescissionary damages.

Indeed, defendant's construction and application of *Bridgmon* is at odds with *Sheppard v. Blitz*, 177 Or 501, 163 P2d 519 (1945). In *Sheppard*, the Supreme Court explicitly addressed the question of when a remedy of rescission has been irrevocably elected. There, the plaintiff initially had sought rescission and, after rescission had been granted but the decision had been overturned on appeal and remanded, the plaintiff amended the complaint to seek damages for a breach of contract. *Id.* at 503-04. In determining that no irrevocable election had been made, the Supreme Court endorsed the following analysis from the *Restatement of the Law of Restitution* § 68:

"(2) A person who avoids a transaction is not entitled subsequently to affirm the transaction, unless the avoidance was induced by the fraud, material misrepresentation or duress of the transferee. A person does not avoid a transaction until:

"(a) he has regained all or a substantial part of what he gave and to which he would be entitled only upon avoidance, or

"(b) he has obtained a final judgment or decree based upon the avoidance, or

"(c) the other party has changed his position in reliance upon a statement of disaffirmance or has manifested his consent thereto."

*Sheppard*, 177 Or at 509. The court went on to quote with approval the following comment from the *Restatement*:

> "A manifestation of an affirmance of a voidable transaction made freely and without mistake cannot be rescinded; a manifestation of a disaffirmance, however, does not of itself operate as an avoidance. Thus a statement that one disaffirms, or ineffectual attempts to obtain what has been given, are not conclusive. * * * *There is no definitive avoidance until the person seeking to avoid has regained all or part of what he gave, has obtained a judgment or decree by the enforcement of which he will be put back into his original position, has caused the other party to change his position in reliance upon the avoidance, or has contracted with the other party upon the basis of this disaffirmance.*"

*Id.* at 509-10 (quoting *Restatement of the Law of Restitution* § 68 comment on subsection 2) (emphasis added).

■ Under *Sheppard*, with its endorsement of the *Restatement* formulation, a plaintiff's declaration of intent to rescind a contract does not, in and of itself, operate as a rescission of a contract as a matter of law or as an irrevocable election of a rescission remedy. Defendant does not suggest that subsections (2)(a) and (2)(b) have any application to the present situation. However, defendant does contend that "there was substantial uncontroverted *evidence at trial* that Parker changed his position promptly and dramatically in response to Venture's rescission letter and complaints" (emphasis added), thus suggesting that subsection (2)(c) has been satisfied. That argument assumes that evidence presented *at* trial is pertinent to whether pleadings should have been stricken or claims dismissed *before* trial. The temporal conflation is patent—and erroneous. To paraphrase one of our Supreme Court's observations in a very different context, that conflation is impermissible "at least * * * until the cosmological theory of reversible time is better established." *Kay v. David Douglas Sch. Dist. No. 40*, 303 Or 574, 577, 738 P2d 1389 (1987), *cert den*, 484 US 1032 (1988).

■ To the contrary, the correctness of the trial court's ORCP 21 A(8) ruling can be determined only by reference to the content of the pleadings themselves. Here, nothing on the

face of the second amended complaint alleges facts demonstrating that defendant had "changed his position in reliance upon a statement of disaffirmance" by plaintiff. *Restatement* at § 68(2)(c).

We note, moreover, that defendant did not assert election of remedies *as a defense*, which he easily could have done had he chosen to file an answer, and to allege that he "ha[d] changed his position in reliance upon a statement of disaffirmance" by plaintiff. *Id. See generally Stroup v. Conant*, 268 Or 292, 298, 520 P2d 337 (1974) (election of remedies defense in case involving rescission could not be asserted based on a "general denial," but should have been raised under "a plea in abatement"); *Franconi v. Graham*, 89 Or 619, 624, 174 P 548 (1918) ("[S]ince the prior election of an inconsistent remedy is a bar, and therefore an affirmative defense, we are of the opinion that to be made available it must be pleaded."). In sum, the trial court, in granting defendant's ORCP 21 motions, could not properly have considered an unpleaded "election of remedies" defense based on facts not apparent on the face of plaintiff's complaint.[3]

The foregoing analysis applies, and controls, regardless of the fact that the trial court first granted defendant's ORCP 21 E motion to strike and then granted the ORCP 21 A(8) motion to dismiss—that is, that the latter was predicated on the former. In his motion to strike, defendant argued that allegations of the breach of contract claim were "sham, frivolous or irrelevant" as being irreconcilable with the rescissionary allegations of the second amended complaint. On appeal, defendant also argues that the allegations of the superseded pleadings demonstrate that plaintiff had irrevocably elected to rescind immediately after it refused to go

---

[3] To the extent that defendant invites us to treat an unpleaded defense that he had changed position in reliance on plaintiff's disaffirmance as an alternative basis for affirming the trial court's dismissal, we are unable to do so. *See State ex rel Dewberry v. Kulongoski*, 220 Or App 345, 360-61, 187 P3d 220 (2008) (claim preclusion defense could not be raised on appeal as an alternative basis for affirmance, as it had not been pleaded); *Fox v. Collins*, 213 Or App 451, 460, 162 P3d 998, *rev den*, 343 Or 223 (2007) (statute of limitations defense raised in the first instance on appeal did not provide alternative basis for affirmance; citing cases); *cf. Franke v. ODFW*, 166 Or App 660, 666, 2 P3d 921 (2000) (unless immunity defense could be established on the face of the plaintiff's complaint, it was not a proper subject of an ORCP 21 dismissal).

through with the transaction. Defendant asserts that, under *Greulich v. The City of Lake Oswego*, 12 Or App 235, 504 P2d 1390 (1973), the use, as extrinsic evidence, of superseded pleadings is proper in the context of a motion to strike.

■ ■ *Greulich* does not bear the weight that defendant assigns to it—and particularly does not permit a court, in ruling on a motion to strike, to consider a party's superseded pleadings as *substantive evidence* precluding a claim. In *Greulich*, we considered whether a trial court had abused its discretion in striking a pleading as frivolous because it repleaded matters that the court had already twice stricken from prior iterations of the complaint. We affirmed, invoking "the general rule that a pleading that is but a repetition of a former one to which a demurrer has been sustained or which has been stricken out may be regarded as frivolous * * *." *Id.* at 236-37 (internal quotation marks omitted). Consequently, under *Greulich*, a court, in ruling on whether allegations are frivolous, is permitted to refer to prior pleadings to discern whether those allegations have been previously pleaded and stricken or dismissed.

■ With *Greulich* properly so understood, that case is inapposite here for two reasons. First, and most obviously, in this case, the allegations of plaintiff's prior complaints had not been stricken or dismissed as legally insufficient; rather, in filing the second amended complaint, plaintiff merely reiterated what had been in its prior complaints, omitting some allegations and adding others, and adding a new theory of recovery in damages. Given those circumstances, the superseded pleadings have no bearing on whether the second amended complaint contains "frivolous" allegations or states a legally sufficient claim for breach of contract.[4]

Second, in a related sense, defendant here was not attempting to use plaintiff's superseded pleadings for the

_____

[4] Here, defendant apparently is attempting to use facts alleged in plaintiff's superseded pleadings as binding judicial admissions that preclude plaintiff from recovering damages under one of its pleaded theories. Although a statement of fact in a pleading *that has not been superseded* is a judicial admission that the fact as stated exists, a party that repleads is not so bound. *See McGanty v. Staudenraus*, 321 Or 532, 538-39, 901 P2d 841 (1995) (citing *Yates v. Large*, 284 Or 217, 223, 585 P2d 697 (1978) (a trial court may relieve a party from the effect of an admission in a pleading by allowing amendment of the pleading)).

purpose approved in *Greulich*. Rather, it was attempting to use the content of those pleadings for a *substantive* purpose— *viz.*, as evidence that plaintiff had, in fact, elected to pursue rescission in lieu of damages. Neither *Greulich* nor any other Oregon authority of which we are aware sanctions such a use of extrinsic materials in the context of a motion to strike.

In sum, the trial court erred both in granting defendant's ORCP 21 E motion to strike and defendant's ORCP 21 A(8) motion to dismiss.[5]

## II. THE ORCP 54 B(2) DISMISSAL

A. *Substantive Standard and Standard of Review*

Three provisions frame our review of the trial court's ORCP 54 B(2) dismissal in this case. First, ORCP 54 B(2) provides:

> "After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment of dismissal with prejudice against the plaintiff, the court shall make findings as provided in Rule 62."

ORCP 62 F, in turn, provides:

> "In an action tried without a jury, except as provided in ORS 19.415(3), the findings of the court upon the facts shall have the same force and effect, and be equally conclusive, as the verdict of a jury."

---

[5] We reject without published discussion defendant's other, alternative grounds for affirmance on this assignment of error. Those arguments are premised on defendant's assumption that the later ORCP 54 B dismissal was properly granted. Since we conclude otherwise, as noted below, we need not address defendant's alternative arguments.

Finally, ORS 19.415(3) provides:

"Upon an appeal from a judgment in an equitable proceeding, the Court of Appeals shall try the cause anew upon the record."

Those provisions collectively indicate that, in a case (such as this) that involves rescission claims tried to the court, (1) the trial court was entitled to dismiss upon making findings of fact concerning plaintiff's evidence, and (2) those findings are subject to *de novo* review in this court.

Consistently with that understanding, defendant contends that a trial court is entitled to dismiss with prejudice under ORCP 54 B(2) if, after hearing only the plaintiff's case-in-chief, the court is unpersuaded by that evidence and renders corollary findings. The standard of appellate review of such a dismissal would, in turn, depend on the nature of the claim(s) dismissed with prejudice: If, as here, the claim is equitable, we are to engage in *de novo* review, reweighing the evidence, while according substantial weight to any credibility determinations by the trial court. *See, e.g., Muhlheim v. Armstrong*, 217 Or App 275, 284, 175 P3d 521 (2007), *rev den*, 344 Or 558 (2008). If, however, the dismissed claim is legal in nature, we engage in the review prescribed when the court (or jury) has acted as trier of fact of such a claim—*viz.*, regardless of whether the plaintiff has proffered legally sufficient evidence of the claim, is there "any evidence" supporting the trial court's rejection/dismissal of that claim?

Plaintiff vigorously disputes that view of the trial court's ORCP 54 B(2) dismissal function—and, by necessary extension, of our appellate review function. Specifically, plaintiff asserts that an ORCP 54 B(2) motion is to be granted only if a plaintiff fails to make out a *prima facie* case, and that we "review such a ruling for legal error, inquiring whether the evidence in the trial record establishes a *prima facie* case." *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 323, 129 P3d 773, *rev den*, 341 Or 366 (2006) (citing *Dillard and Dillard*, 179 Or App 24, 29 n 2, 39 P3d 230, *rev den*, 334 Or 491 (2002)).

Both parties invoke authority from our court supporting their irreconcilable positions. For the most part, the

parties cite different precedents—but, in at least one instance, they both rely on the same case (*Castro and Castro*, 51 Or App 707, 626 P2d 950 (1981)) as fundamental authority. That is unsurprising, for our decisions addressing ORCP 54 B(2) are snarled. We have, over time, conflated standards of dismissal *with* prejudice under ORCP 54 B(2) with those governing dismissals *without* prejudice—and have, concomitantly, erroneously conflated standards of appellate review.[6]

We are, thus, called upon to revisit and explain—and, in some instances, clarify—our case law. As will become apparent shortly, *Castro* is central to that exercise. But, before we address our own "judicial gloss," we return, consistently with *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), to the origins of ORCP 54 B(2) as described in our early case law.

ORCP 54 B(2) was enacted in 1979. Or Laws 1979, ch 284, § 32. In *Castro*, we stated that the legislative history of ORCP 54 B(2) shows that it allows "a motion to dismiss to test the sufficiency of the evidence at the close of plaintiff's case in nonjury cases."[7] 51 Or App at 710. As we further noted in *Castro*, ORCP 54 B(2) was virtually identical to the then-existing version of FRCP 41(b), which read as follows:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal

---

[6] As explained below, notwithstanding our sometimes amorphous and inconsistent discussions with respect to review of a trial court's allowance of an ORCP 54 B(2) motion, we appear to have consistently enunciated the proper standard of review for a trial court's *denial* of such a motion.

[7] As a matter of historical interest, we note that the commentary to ORCP 54 B(2) provides:

"Subsection 54 B(2) is also from the federal rule and covers a judgment of dismissal at the close of a claimant's case for insufficiency of the evidence in cases tried without a jury. Existing ORS 18.210 and 18.220 refer to equity cases. The former equity rule that a party could move for dismissal at the close of the plaintiff's case, only at the price of waiving the right to present evidence, is specifically changed. This rule also changes the former rule that a judgment of dismissal at the close of the plaintiff's case did not bar another suit; under subsection B(4), the judgment of dismissal is with prejudice unless the court specifies otherwise."

Frederic R. Merrill, *Oregon Rules of Civil Procedure: A Handbook* 109-10 (1981).

on the ground that upon the facts and the law the plaintiff has shown no right to relief. *The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.* If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."[8]

*Castro*, 51 Or App at 709 n 2 (quoting FRCP 41(b)) (emphasis added).

The above emphasized language in FRCP 41(b) was added in 1946 to resolve a conflict under a prior version of the rule. As the commentary to the 1946 federal revisions explains:

"In some cases tried without a jury, where at the close of plaintiff's evidence the defendant moves for dismissal under Rule 41(b) on the ground that plaintiff's evidence is insufficient for recovery, the plaintiff's own evidence may be conflicting or present questions of credibility. In ruling on the defendant's motion, questions arise as to the function of the judge in evaluating the testimony and whether findings should be made if the motion is sustained. *Three circuits [the Sixth, Seventh, and Ninth] hold that as the judge is the trier of the facts in such a situation his function is not the same as on a motion to direct a verdict, where the jury is the trier of the facts, and the judge in deciding such a motion in a non-jury case may pass on conflicts of evidence and credibility, and if he performs that function of evaluating the testimony and grants the motion on the merits, findings are required.* * * * The Third Circuit has held that on such a motion the function of the court is the same as on a motion to direct in a jury case, and that the court should only decide whether there is evidence which would support a judgment for the plaintiff, and therefore, findings are not required by Rule 52. * * * *The added sentence in Rule 41(b) incorporates the view of the Sixth, Seventh and Ninth Circuits.*"

*Notes of Advisory Committee on Rules, 1937 Adoption*, Rule 41(b), *reprinted in Federal Civil Judicial Procedures and Rules* 210-11 (West ed 2008) (emphasis added).

---

[8] FRCP 41 was completely revised in 1991. Provisions of the former version of the rule that are analogous to those of ORCP 54 B(2) are now found in FRCP 52.

Thus, as we summarized the evolution of FRCP 41, and its relation to ORCP 54 B(2), in *Castro*, 51 Or App at 710:

"The federal rule in its present form, upon which ORCP 54 B(2) is based, has been uniformly interpreted by federal courts to allow the trial court in nonjury cases to weigh the evidence, to determine the facts without making inferences in favor of plaintiff, and to grant or deny the motion accordingly. The purpose of the rule is to expedite the trial of cases by giving the trial court the power to dispose of cases at the earliest opportunity. *Bach v. Friden Calculating Mach. Co.*, 148 F2d 407, 410-11 (6th Cir 1945). *The function of the trial court under FRCP 41(b) is to decide both questions of fact and of law, in contrast to the function of the trial court judge in a jury case on a motion for directed verdict under FRCP 50(a).* In the latter instance, before submitting the case to the jury, the trial judge must consider the evidence in the light most favorable to plaintiff to determine whether plaintiff has established a prima facie case, the question being one of law whether the evidence is sufficient to sustain a verdict for plaintiff. *See generally*, 5 Moore's Federal Practice, § 41.13(4), 4-189-94 (1980)."

(Emphasis added.)

█ We turn then to *Castro* as the baseline of our subsequent case law development. In *Castro*, the father moved to modify an award of custody and, at the close of the father's evidence, the trial court granted the mother's motion for dismissal with prejudice under ORCP 54 B(2). We reversed and, in doing so, extensively discussed the proper application of ORCP 54 B(2). After addressing the rule's derivation from FRCP 41(b), we concluded:

"The language of FRCP 41(b) * * * and hence that of ORCP 54 B(2), clearly indicates that the task of the trial judge in ruling on defendant's motion to dismiss is *not* to apply the prima facie test employed in ruling on a motion for directed verdict. Under ORCP 54 B(2) the defendant moves for dismissal 'on the ground that *upon the facts and the law* the plaintiff has shown no right to relief.' (Emphasis supplied.) Furthermore, '[t]he *court as trier of the facts may then determine them* and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence.' (Emphasis supplied.)"

*Castro*, 51 Or App at 710-11. Thus, we concluded that the standard for dismissal with prejudice under ORCP 54 B(2) is not congruent with the standard for a directed verdict under ORCP 60, which requires that such a motion be denied if the plaintiff has made out a *prima facie* case. Rather, the trial court can grant a motion to dismiss under ORCP 54 B(2) on *either* of two grounds: (1) The plaintiff has failed to present a *prima facie* case (the "directed verdict" standard); *or* (2) even if the plaintiff has presented a *prima facie* case, the court, as trier of fact, is unpersuaded by the plaintiff's evidence.

Our explication did not end there, however. We noted that several states that had also adopted analogs of FRCP 41(b), *e.g.*, Alaska, Wyoming, and Florida, construed their rules as allowing trial courts to determine only whether the plaintiff had made out a *prima facie* case—and not to assess the persuasiveness of a plaintiff's evidence. *Id.* at 711-13. While declining to adopt that approach, as irreconcilable with the language of ORCP 54 B(2), we observed that there was "considerable merit to the policy rationales" underlying the view of those other jurisdictions. *Id.* at 713. Specifically: "Justice is more likely to be achieved and appeals reduced when the trial judge is not permitted to dismiss in close cases before having heard both sides of the issues and has obtained a complete picture of the controversy." *Id.* We also noted the detrimental consequences of "partial trials followed by appeals and retrials" that can arise from "promiscuous use" of the rule. *Id.* We then concluded:

> "Where the plaintiff has introduced credible evidence on the essential elements of the cause or causes of action, the trial court should deny the motion and decline to render any judgment until the close of all the evidence. In order to protect plaintiffs in nonjury cases from premature dismissals and to alleviate the appellate burden of multiple appeals, we adopt the view * * * that motions under ORCP 54 B(2) should be sparingly granted."

*Id.* (footnote omitted).

■ In sum, *Castro* announced two basic principles. *First,* a trial court can properly dismiss with prejudice under ORCP 54 B(2), even if the plaintiff has presented a *prima facie* case, if the court, as trier of fact, is unpersuaded at the close of

plaintiff's case-in-chief. *Second*, that authority is discretionary, not mandatory—and, as a prudential matter, should be exercised with restraint.

We have reiterated those principles in later cases. *See, e.g., Boynton-Burns v. University of Oregon*, 197 Or App 373, 383, 105 P3d 893 (2005) (noting that ORCP 54 B(2) allows the trial court to weigh the evidence, but that motions under that rule should be sparingly granted); *Int'l Electrical Workers v. Central Lincoln PUD*, 85 Or App 372, 376, 736 P2d 606 (1987) (noting that court, in deciding motion under ORCP 54 B(2), was entitled to resolve conflicts in the plaintiff's evidence); *Joseph v. Cohen*, 61 Or App 559, 563, 563 n 2, 658 P2d 544 (1983) (court, in deciding motion under ORCP 54 B(2), was entitled to determine facts and disbelieve plaintiff's evidence).

The problem is that we have not consistently and clearly applied those principles. More particularly, on occasion, we have inadvertently (1) conflated the standard of dismissal *with* prejudice with the standard governing dismissal *without* prejudice under ORCP 54 B(2) and (2) conflated the standards for appellate review of the *allowance* of an ORCP 54 B(2) dismissal with that for the *denial* of such a motion.

The confusion appears to trace to *Gearhart v. Employment Div.*, 99 Or App 601, 783 P2d 536 (1989), *rev den*, 310 Or 70 (1990). In *Gearhart*, the trial court dismissed the plaintiff's wrongful discharge action pursuant to ORCP 54 B(2), but did not specify that the dismissal was with prejudice—and, thus, was not required to make factual findings in support of its dismissal. We affirmed, concluding that "review of that determination, *if the judgment is without prejudice*, is limited to whether plaintiff had established a *prima facie* case." *Id.* at 604 (footnote omitted; emphasis added). Thus, in *Gearhart*, we applied the directed verdict/*prima facie* standard to allowance of a motion under ORCP 54 B(2) to dismissal *without* prejudice. We did not suggest that that standard was the exclusive standard for allowing (and reviewing) dismissals *with* prejudice under ORCP 54 B(2)— and, indeed, given *Castro*, could not have done so.[9] *See also*

_____

[9] The dissenting opinion in *Gearhart* contended that the dismissal without prejudice was not reviewable and that the review for *prima facie* evidence to

*Nolan v. Jackson National Life Ins. Co.*, 155 Or App 420, 433, 963 P2d 162 (1998), *rev den*, 328 Or 275 (1999) (for dismissal without prejudice under ORCP 54 B(2), appellate court reviews to determine whether plaintiff presented *prima facie* case); *Jensen v. Alley*, 128 Or App 673, 877 P2d 108, *rev den*, 320 Or 272 (1994) (same).

*Gildow v. Smith,* 153 Or App 648, 957 P2d 199 (1998), arose in the same procedural posture as *Gearhart—viz.*, the allowance of an ORCP 54 B(2) dismissal without any concomitant findings—and followed the rule announced in *Gearhart*. However, in *Gildow*, 153 Or App at 652, we cited as authority for the *prima facie* standard on review *Ranger Ins. Co. v. Globe Seed & Feed Co., Inc.*, 125 Or App 321, 327, 865 P2d 451 (1993), *rev den*, 318 Or 458 (1994)—and, *Ranger*, in turn, concerned our review of a *denial* of a motion under ORCP 54 B(2). Specifically, in *Ranger*, we noted that, in reviewing such a denial, we determine only "whether there was evidence sufficient to make out a *prima facie* case." *Id.* (citing *Scholes v. Sipco Services & Marine, Inc.*, 103 Or App 503, 506, 798 P2d 694 (1990) (reviewing denial of ORCP 54 B(2) motion)). In *Ranger*, we also cited *Jordan v. Rask*, 66 Or App 720, 723, 674 P2d 1211 (1984), as substantiating that standard of review. However, *Jordan* contained no reference to the *prima facie* review standard—and, to complete the conflation, concerned the *granting* of an ORCP 54 B(2) motion (which we reversed) rather than a *denial*.[10]

Thus, our case law incrementally drifted from *Castro*, losing sight of any distinction between (1) the granting of a motion under ORCP 54 B(2) with prejudice and findings, (2) the granting of such a motion without prejudice and without findings, and (3) the denial of such a motion. Rather, straying from the analysis prescribed in *Castro*, we generically applied the *prima facie* standard, or something akin to it.[11]

---

support the plaintiff's case was "contrary to the intent of ORCP 54 B(2) and may undo completely what the trial court has done as the trier of the facts." *Id.* at 606 (Buttler, J., dissenting).

[10] In *Jordan*, it appears that we may have followed the standard of review set forth in *Castro*, but, on *de novo* review, simply disagreed with the trial court's conclusion that the plaintiff's evidence was not sufficiently corroborated. *Jordan*, 66 Or App at 723-24.

[11] For example, in *Dillard*, the father moved to modify custody, and the trial court, after the presentation of the father's evidence, granted the mother's motion

Moreover, even cases that purported to apply the standard enunciated in *Castro* appear to have blurred the potential differences between a review of a trial court's grant of a motion pursuant to ORCP 54 B(2) with prejudice and explicit findings, and review to determine whether a plaintiff made out a *prima facie* case. *Clark and Clark*, 171 Or App 205, 14 P3d 667 (2000), is exemplary.

In *Clark*, the wife moved to hold the husband in contempt for failing to abide by a stipulated property settlement embodied in a dissolution judgment. At the close of the wife's case—in which the husband was called to testify as an adverse witness—the husband moved for dismissal pursuant to ORCP 54 B(2). *Id.* at 207-08. The trial court granted the motion, making specific findings concerning the credibility and demeanor of the witnesses, and concluding that the wife failed to prove that the husband had acted willfully in failing to satisfy the terms of the settlement. *Id.* at 209. We stated:

"In reviewing a dismissal under ORCP 54 B(2), we consider the entire record to determine whether evidence established each of the essential elements of the plaintiff's claim.

---

to dismiss with prejudice pursuant to ORCP 54 B(2). 179 Or App at 28-29. The father's attorney contended that the father had presented a *prima facie* case, and the trial court agreed but dismissed, nevertheless, after observing, "[B]ut do we want to sit here for two or three hours and hear testimony that's not going to make any difference?" The trial court then rendered written findings in support of its dismissal. *Id.* at 29.

We affirmed, but, in doing so, began our opinion by stating that our standard of review was "to determine whether father presented a *prima facie* case, viewing the evidence in the light most favorable to father." *Id.* at 26. That statement of our standard of review was misleading in that it was incomplete—*viz.*, the correct statement would have been that (in that custody modification *de novo* review context), we review to determine (1) whether the father presented a *prima facie* case (which we determined that he had, *id.* at 30-32); or (2) even if the father had presented a *prima facie* case, the trial court had erred in finding that evidence not to be persuasive.

Further, on occasion, we have, in describing our standard of review, referred to both of the disjunctive standards for allowance of dismissal under ORCP 54 B(2) without clarifying their relationship. For example, in *Mark Wendt Homes, Inc. v. Wilcher*, 186 Or App 416, 63 P3d 1271 (2003), in which we affirmed the denial of a motion under ORCP 54 B(2) to dismiss a lien foreclosure action, we described our standard of review as follows:

"Only when a plaintiff has failed to make out a *prima facie* case is it appropriate to grant such a motion. * * * We review the whole record to determine whether the plaintiff introduced 'credible evidence' on the essential elements of the claim."

*Id.* at 418 (citations omitted).

*Castro and Castro*, 51 Or App 707, 713, 626 P2d 950 (1981). The determination of whether the essential elements of a claim have been established—in other words, whether a *prima facie* case was made—is a question of law."

*Id.* at 210. Thus, in *Clark*, we cited *Castro* as providing the appropriate standard, but apparently overlooked that *Castro* also said that "ORCP 54 B(2) * * * clearly indicates that the task of the trial judge in ruling on defendant's motion to dismiss is *not* to apply the prima facie test * * *." *Castro*, 51 Or App at 710-11 (emphasis in original). We went on to hold that the wife had, in fact, established a *prima facie* case. *Clark*, 171 Or App at 213.[12]

■ The upshot is that much of our case law since *Castro* involving the granting of ORCP 54 B(2) motions has been unclear and, in some instances, inconsistent. We thus return to and reiterate the basics as set forth in *Castro*: In deciding whether to grant a motion to dismiss with prejudice under ORCP 54 B(2), the trial court is *not* required to view the evidence in the light most favorable to the plaintiff and to deny the motion if the plaintiff has proffered "some evidence" establishing the requisites of a *prima facie* case. *See generally Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003) (setting forth directed verdict standard); *Bolt v. Influence, Inc.*, 333 Or 572, 577-78, 43 P3d 425 (2002) (explaining that question in relation to directed verdict is whether plaintiff has presented some evidence in support of a *prima facie* case).

Rather, even if a plaintiff has presented a *prima facie* case, a trial court is free to assess the ultimate persuasiveness of the plaintiff's evidence, *see Castro*, 51 Or App at 710-11, including resolving conflicts in that evidence, *see Int'l Electrical Workers*, 85 Or App at 376, and, if it so chooses, to simply disbelieve the plaintiff's evidence. *Joseph*, 61 Or App at 563, 563 n 2.

---

[12] Our ultimate disposition in *Clark* did not rest on any erroneous application of the *Castro* standard, however. In *Clark*, we concluded that the ORCP 54 B(2) motion had been granted improperly because the court "erred when it prematurely decided husband's affirmative defense during wife's case-in-chief and dismissed the proceeding." 171 Or App at 213. That disposition is not called into question by our analysis in this case.

Of course, a court deciding a motion under ORCP 54 B(2) can *also* dismiss—either with or without prejudice—if the plaintiff has failed to present a *prima facie* case.[13] Our point is that, under ORCP 54 B(2)—unlike ORCP 60—the court is not *limited* to considering whether the plaintiff has presented evidence of a *prima facie* case. Further, and in all events, for reasons that will soon be apparent, we reiterate *Castro*'s admonition that the power of dismissal under ORCP 54 B(2) should be employed "sparingly"—especially in cases involving equitable claims—to avoid unnecessary remands for new trials. *Castro*, 51 Or App at 713.

■ With that understanding of the trial court's substantive standards for allowing ORCP 54 B(2) dismissals, the scope of our review is clear: Because plaintiff's rescission claims are equitable in nature, our review is *de novo*. We try the case "anew upon the record." ORS 19.415(3). Under that standard, we give considerable weight to determinations of credibility made by the trial court. *Muhlheim*, 217 Or App at 284. Here, however, we do not understand the trial court to have made determinations entitled to such deference.[14]

Thus, we review the record *de novo* and, if we determine on that review that we, like the trial court, are not persuaded by plaintiff's proof, we will affirm. Otherwise, we must reverse and remand for a new trial—or, at least, the

---

[13] *See, e.g., Beaty v. Oppedyk*, 212 Or App 615, 159 P3d 1157 (2007), applying "directed verdict"-like standard in affirming allowance of what the parties described as a "directed verdict" motion and we treated as an ORCP 54 B(2) motion to dismiss with prejudice a claim for specific performance of a land sale contract. Thus, in *Beaty*, although we did not draw a distinction between the criteria for a motion for a directed verdict under ORCP 60 and those for a motion under ORCP 54 B(2), we nonetheless reached the correct result because the issue presented was whether the plaintiff had failed to produce evidence of one of the elements of his claim. 212 Or App at 617.

[14] Some of the trial court's factual findings suggest that it may have had some doubts about some aspects of plaintiff's evidence. For example, one of the findings reads: "Venture Properties *claims* it was [at the time of the site visit in early April] that it learned of Parker's violation notice and at that time became aware of the 2003 correspondence between Parker, [the Department of State Lands], [the Army Corps of Engineers], and Martin Schott on this issue." (Emphasis added.) We do not consider factual findings such as that to be sufficient to indicate that the trial court made specific determinations that plaintiff's witnesses were not credible as to when plaintiff found out about the wetlands violation notice, particularly in light of the fact that no contrary evidence was introduced.

completion of the trial by way of submission of defense and rebuttal evidence.

B. *Facts Pertinent to Dismissal of the Claims Seeking Rescission*

On *de novo* review of the evidence presented in plaintiff's case-in-chief, we find that plaintiff has, pending controversion by defendant's evidence, persuasively established the following facts material to rescission:

Defendant acquired the property in December 2003 for $6.5 million. The land was "raw"—that is, undeveloped—and he intended to develop it into a subdivision of homes. To change "raw" land into "entitled lots," a developer must obtain necessary zoning changes and approval of a preliminary plat with conditions of approval, which include measures to address environmental concerns such as the protection of wetlands.[15] As explained below, defendant immediately took steps to create "entitled lots" from the property.

In the spring of 2003, defendant retained a civil engineer to prepare a preliminary plat layout for the property. Also in the spring of 2003, defendant had vegetation cleared from the property—and in the course of that clearing, defendant cleared vegetation and dug a ditch on a portion of the property that contained wetlands. It is unusual for developers to take actions such as clearing vegetation and ditch-digging in wetlands before obtaining a delineation of the wetlands and receiving the necessary approvals from the Department of State Lands (DSL) or the Army Corps of Engineers (the Corps). As a result of defendant's activity in the wetlands in the spring of 2003, the Corps sent defendant a cease-and-desist letter in May 2003, asserting that defendant's activities violated the Clean Water Act. Shortly thereafter, DSL also notified defendant that the activities in the wetlands violated the Oregon Removal-Fill Law. The DSL letter stated, in part:

---

[15] "Finished lots" are even further along, in that streets and curbs are in place in the development and construction of homes may begin.

"At this point, two options exist to resolve the violation without the immediate imposition of a civil penalty. First, develop a restoration plan for impacted areas and implement it according to a mutually agreed upon schedule and sign off with a document binding you to the action of civil penalties and an order will result. On the other hand, if future impacts are anticipated, a signed agreement under which you apply for the permit (which would include addressing the existing impacts) could result in resolution of the enforcement case. Under the second option the agreement will be a formal document where failure to apply for or to carry out the actions in a permit if awarded will result in civil penalties and restoration of the disturbed wetland."

In July 2003, defendant signed a consent order with DSL in which he stipulated that he had violated the Removal-Fill Law and agreed to restore the wetland to the satisfaction of DSL. The consent order indicated that the restoration could occur in the course of the process of defendant applying for a permit to conduct additional fill or removal activity or, alternatively, that defendant would "[p]rovide and implement a restoration plan in the event an application is not submitted by August 10, 2003 or should the application be denied." The consent order further provided that the restoration would be completed by June 2004.

Meanwhile, defendant had retained the services of Martin Schott, a wetlands specialist, who inspected the property and who prepared a wetlands delineation and a report for defendant. That report, dated July 2003, noted that vegetation had been cleared and that a ditch had been cut into the wetlands, and stated: "If the state decides they have jurisdiction in this matter and that there was a violation, any violation will be resolved during the permitting process for the project which is proposed for the site."

In October 2003, a DSL wetlands specialist, Goodrich, communicated to Schott that she had concerns about the wetlands delineation and that she would like to make an additional site visit.

On January 23, 2004, a DSL compliance specialist wrote to defendant, stating that, in the consent order, defendant had

"agreed to either submit a plan to restore the wetland or submit an application for permit through which mitigation for the impacts would be provided. At this time we have not received any further communications from you regarding these options. For this reason you are subject to a civil penalty of $10,000.00."

On January 27, 2004, defendant went to plaintiff's office to see plaintiff's attorney, Kelly Ritz, about the possibility of selling the property to plaintiff. Ritz did not have time to discuss the matter with defendant, but Morissette, plaintiff's owner, met with defendant. Morissette visited the property with defendant that day, and defendant represented to Morissette that the property would consist of entitled lots. Morissette and defendant reached an agreement for plaintiff to purchase the property, and they returned to Venture's office to have Ritz prepare a letter of intent. Defendant informed Morissette that the plat would be approved that evening by the Happy Valley planning commission.

That evening, Morissette sent one of his project managers, Wendy Hemmen, to the meeting at which defendant received the necessary approval of the plat. The following day, Ritz prepared the purchase and sale agreement. The purchase and sale agreement, as noted above, *see* 223 Or App at 323-24, contained specific provisions that the configuration of the property as shown on the plat would not be changed without the purchaser's consent, that the seller believed the property to be in compliance with applicable state and federal environmental standards, and that the seller had not received any notices of violations from regulatory agencies. The purchase and sales agreement included the map that showed the plat as approved by the planning commission and reflected the wetlands delineation prepared by defendant's wetlands consultant, Schott.

In early February, Hemmen first met with Schott. Schott informed Hemmen that he had done the wetlands delineation, that they had a wetlands concurrence, that he had filled out the Corps permit, and that it was ready to submit. Hemmen had asked defendant for the wetlands delineation report, but he had not forwarded it to her. Schott forwarded the wetlands delineation report to Hemmen in mid-February. On February 17, plaintiff retained Schott as

its wetlands consultant on the project. Schott did not inform plaintiff about the wetlands violation, or that he was continuing to work for defendant to resolve the wetlands violation issue. The wetlands report that he provided Hemmen contained the following paragraph:

> "In May [2003], the property owner cut a ditch into Wetland A. Once he was alerted to this potential wetland violation, he filled in the ditch and initiated erosion control measures. For the most part, most of the damage was repaired. We estimate that, at most, 33 cubic yards of soil was removed. The maximum dimensions of the disturbance was 100 ft x 3 ft x 3 ft. If the state decides that they have jurisdiction in this matter and that there was a violation, any violation will be resolved during the permitting process for the project which is proposed for the site."

Schott did not discuss that portion of the wetlands delineation with any of plaintiff's representatives. Meanwhile, Schott continued to work with defendant to resolve the DSL enforcement action concerning defendant's failure to abide by the consent order. Schott did not tell plaintiff about the existence of the enforcement action.

In late February or early March, Schott faxed a portion of the joint fill permit application to Hemmen. Hemmen reviewed it and had Morissette sign it. Morissette did not read it before signing it. One of the pages contained the following question: "Has the proposed activity or any related activity received the attention of the Corps of Engineers or the State of Oregon in the past, e.g., wetland delineation, violation, permit, lease request, etc.?" The "yes" box was checked, and reference numbers were given to a Corps file and the DSL enforcement file. Hemmen believed that the "yes" box had been checked because the property had a wetlands delineation. Neither Morissette, Ritz, nor Hemmen understood that language to indicate that a wetlands violation had occurred on the property or that there was any existing wetlands issue to be resolved. Hemmen returned the portion of the application to Schott, who subsequently filed the application.

Also in early March, defendant reached an agreement with DSL concerning the enforcement action. DSL concluded that additional restoration of the wetlands was not

required, and assessed a civil penalty of $375 for the violation of the Removal-Fill Law.

In late March, Hemmen received a postcard indicating that the Corps had received the application. In early April, Hemmen talked to John Barco, with the Corps. At that time, Hemmen first learned that there had been a wetlands violation on the site. She did not receive information at that point that led her to believe that any wetlands issues would keep the project from going forward as scheduled. Several days later, after Barco had done a site visit, he informed Hemmen that he had significant concerns about the wetlands delineation. Barco's notes of the visits indicated that he scheduled the site visits because he had observed "considerable errors on the wetlands delineation data form in the permit application," and because "much of the site had been previously disturbed through mechanized land clearing."

Barco had visited the site twice in early April. During the second visit, Schott showed Barco the delineated wetlands. Barco brought to Schott's attention the wetlands delineation errors three times during a site visit, but Schott did not respond to Barco's questions. In particular, Barco was concerned that there was a large area of wetlands that might be contiguous with the delineated wetlands that had not been delineated. Hemmen attended a portion of that site visit and understood that there was a problem with the wetlands delineation. She had requested that defendant attend the site visit as well, but he did not do so. During that visit, Hemmen understood that there was a possibility of losing approximately 15 lots from the project because of the wetlands problem.

On April 7, Barco wrote to Hemmen, requesting that a new wetlands delineation be prepared. If the wetlands were as large as Barco suspected they might be, they would have exceeded the half-acre threshold and would have been subject to more stringent requirements under the Clean Water Act, including a 30-day period for public comments. That is, Barco believed there was a possibility that the property would not be eligible for a "fast track" permit but, instead, would have to go through a more stringent process to satisfy

federal law. In Barco's experience, having the Corps require a redelineation of wetlands is an "infrequent occurrence."

After her initial discussions with Barco in early April, Hemmen became concerned "that there was a very large wetlands in the middle of our nice flat lots." On April 7, Hemmen met with Morissette and Ritz and told them that they would potentially lose approximately 15 lots, that the "best case scenario" was that the problem would delay the start of the project by about five months, and that, in light of increased costs and loss of lots, the project could ultimately be worth $1 to $4 million less than projected. Hemmen also was concerned that the location of the additional wetlands would prevent plaintiff from constructing its model homes in the most desirable locations, which was important to plaintiff because of its practice of showing model homes to potential customers and then building homes for particular customers, rather than simply building homes on speculation and looking for buyers for them. Hemmen's concerns were reasonable from a developer's point of view. Hemmen understood at that point that the property would not be able to be developed into the 210 lots as shown on the preliminary plat map. Hemmen attempted to contact defendant on April 7, but she did not hear back from him.

On April 8, one of plaintiff's attorneys wrote to defendant's attorney, summarizing what Hemmen had recently learned about the wetlands problems on the property, asserting that, by failing to inform plaintiff of the ongoing DSL enforcement action, defendant had breached the warranties in the agreement, and indicating that plaintiff would expect defendant to bear the costs of additional expenses incurred because of the wetlands problems. Defendant did not respond to that letter.

Hemmen asked Schott to start work on a new wetlands delineation—and, on April 13, Schott told Hemmen that he estimated that there was approximately an additional acre of wetlands.

On April 14, plaintiff made the decision not to proceed with the purchase of the property. Plaintiff informed defendant by letter of its decision to rescind the contract,

asserting that defendant had breached the warranties in the sales agreement:

> "You failed to disclose the problems with the wetlands in which you have been embroiled with the Division of State Lands and the Army Corps of Engineers. This has caused a significant impact on the contemplated project, including without limitation time delays, loss of lots, additional engineering costs, and development costs. As a result the Property is not viable for the use contemplated by my client, and the project can no longer be developed as planned."

Morissette, Ritz, and Hemmen all regarded defendant's failure to disclose the problems with the wetlands as material to plaintiff's decision not to go forward with the purchase of the property. In particular, they believed that the requirement that the wetlands be redelineated meant that there would be additional expenditures, that the property could not be developed as shown on the preliminary plat, that the model homes they anticipated building at the beginning of the project would not be able to be built in the desired location, and that development could not occur within the projected time frame.[16]

After plaintiff refused to go forward with the purchase, defendant himself obtained the wetlands redelineation and concurrence without too much difficulty, and was able to obtain the required permits to develop the property late in 2004. The plat map needed to be reconfigured based on

---

[16] Expert testimony corroborated that assessment. Randall Sebastian, a developer, testified that (1) disclosure of wetlands violations would be important to a developer in plaintiff's situation and would be material to a decision to purchase property; (2) the need to redelineate the wetlands would be significant because it could affect timing of development; and (3) the violation that had occurred on the property was unusual, because developers typically understand that they should not be draining wetlands and should not be removing all of the vegetation from a site before the wetlands are delineated.

Plaintiff also presented expert testimony by Gregory Summers, a wetlands scientist, that ditch-digging in wetlands is generally done to drain the wetlands, and the additional site visits and need for a redelineation of the wetlands was "partially due to the presence of a prior violation" on the site. According to Summers, it was unusual for a redelineation to be required; he had been involved in hundreds of projects and never had DSL change its concurrence of a wetland delineation before. Summers also corroborated plaintiff's concerns that the need to obtain a redelineation meant that the development of the project would be delayed and that the costs of the project would be increased.

the reconfigured wetlands, which were almost an acre more than originally designated, but, ultimately, defendant was still able to develop the property into 210 lots.[17]

## C. *ORCP 54 B(2) Dismissal: The Merits*

 Rescission is a potential remedy for various harms, including those alleged to have occurred in this case. *See, e.g., Kim v. Park*, 192 Or App 365, 86 P3d 63 (2004), *rev den*, 338 Or 16 (2005) (discussing rescission remedy for breach of contract); *Generaux v. Dobyns*, 205 Or App 183, 194, 134 P3d 983 (2006) ("Mistake, like fraud, is a well-recognized equitable ground for rescission of a contract or other instrument."). To be entitled to rescission, the plaintiff must establish entitlement by "clear and convincing" evidence. *See Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 31, 853 P2d 1350, *rev den*, 317 Or 583 (1993), *vac'd on other grounds*, 512 US 1231, 114 S Ct 2731, 129 L Ed 2d 854 (1994). At least under circumstances such as those at issue in the present case, *e.g.*, breach of contract, fraud, misrepresentation, or mutual mistake, a plaintiff seeking rescission is required to declare its intent to rescind promptly after discovering the grounds for rescission. *See, e.g., Snyder v. Rhoads*, 47 Or App 545, 554, 615 P2d 1058 (1980).

---

[17] Our description on *de novo* review of the material facts is, for the most part, consistent with the trial court's findings. However, the trial court rendered several findings with which we disagree, at least in part. In one finding, the court indicated that "Parker's wetlands expert [Schott] failed to fully comply with the consent order resulting in an assessment of civil penalty on January 26, 2004." Given that defendant, not Schott, was the party to the consent order, we conclude that it was defendant who failed to comply with the consent order.

In another finding, the court noted that DSL sent a letter to defendant of its intent to assess a civil penalty, but went on to note that "[n]o evidence was offered about when Parker received the notice from DSL or if he ever received the notice at all." Plaintiff presented evidence that the letter was sent by certified mail. Under OEC 311(1)(q), there is an evidentiary presumption that "[a] letter duly directed and mailed was received in the regular course of the mail." While that is a rebuttable presumption, no evidence in this record rebuts it.

Finally, the trial court specifically noted that witness Barco had testified that his site visits in April 2004 "had nothing to do with the wetlands violation." Although the trial court may have credited Barco's testimony on that point, we note, as is evident from our statement of facts above, that plaintiff presented other evidence to the effect that the past wetlands violation did, in fact, cause additional scrutiny by DSL and the Corps.

Here, defendant argued, and the trial court agreed, that plaintiff's proof was fatally deficient in any of several respects. And he argued most vigorously that plaintiff had not demonstrated the requisite materiality of any breach (or any nondisclosure or misrepresentation allegedly constituting a breach) for either of two reasons. First, defendant contended, any asserted misrepresentations in the sales agreement regarding the property's current compliance with environmental standards—including defendant's representation that he had not received any notices of violation from regulatory agencies—were immaterial, given that defendant ultimately was able to resolve the DSL violation by paying a $375 fine. Second, defendant asserted, the "materiality" of any supposed nondisclosure misrepresentations regarding the wetlands was belied by the fact that, after plaintiff refused to consummate the sale, defendant was able to successfully develop the property in roughly the same time frame and with generally the same plan as plaintiff had intended.

For its part, the trial court determined that the evidence developed during the presentation of plaintiff's case, including defendant's cross-examination, demonstrated several independently adequate bases for dismissal, which the court expressed as legal conclusions. Specifically, the court concluded that (1) defendant did not materially breach the contract; (2) the contract did not guarantee that the preliminary plat attached to it could be built as illustrated; (3) plaintiff waived any right to rescind the contract based on the wetlands violation because it should have discovered the nature and extent of that violation and its consequences at the time that it employed Schott as a consultant about the violation, but failed to do so, and did not seek to rescind until two months later; (4) defendant "made no innocent or knowing misrepresentation of fact"; (5) the parties were not mutually mistaken about any material fact or condition at the time of the contract or addendum; (6) plaintiff assumed the risk that the wetlands were not as were originally concurred with by DSL; and (7) plaintiff "did not reasonably rely upon any statement or omission by defendant with respect to any issue material to the transaction."

■ Before addressing the central issues presented here concerning misrepresentation and materiality, which were at the core of the trial court's disposition, we first address, and reject, the trial court's analytically distinct determination that plaintiff had somehow waived rescission by failing to seek that remedy promptly.[18] Plaintiff presented evidence that it discovered the wetlands violations in early April and, when defendant failed to respond to its concerns, plaintiff indicated its desire to rescind the contract within two weeks of the discovery of the violation. Nevertheless, the trial court apparently identified the "trigger date" for rescission as being either when plaintiff received Schott's wetlands delineation or when it retained Schott as a consultant in February. The trial court ascribed constructive discovery of the violation to plaintiff as of that time.

We cannot agree. The evidence is uncontradicted that, notwithstanding plaintiff's retention of Schott as a consultant in mid-February, Schott was, at that point, still working for defendant to resolve the wetlands violation on *defendant's* behalf. There is no evidence in the record that Schott told any representative of plaintiff of the violation or of his ongoing work for defendant on that matter. Further, to the extent that the trial court may have been relying on the wetlands delineation prepared by Schott in July 2003, that report merely disclosed that a ditch had been dug. It did not disclose that defendant had received notices of violation from DSL and the Corps; nor did that report mention, much less accurately disclose the contents of, the consent decree that defendant entered into concerning the restoration measures that would be required to remediate the wetlands violation. Accordingly, on this record, plaintiff is not barred from a rescission remedy on the ground that it did not pursue rescission in a timely manner.

■ We turn, then, to the critical and interrelated concepts of misrepresentation and materiality. As noted, *see* 223

---

[18] We do not understand defendant to defend the trial court's reasoning in that regard. Nevertheless, as a potential alternative basis for affirmance, it must be addressed.

Or App at 323, plaintiff sought rescission based, alternatively, on material breach of contract, intentional misrepresentation, innocent misrepresentation, and mutual mistake—and the trial court ultimately rejected each of those theories on alternative rationales of "no breach"/"no misrepresentation," "no materiality," and additionally, "no reasonable reliance" by plaintiff. We begin by addressing misrepresentation (as a function of breach), reliance on such misrepresentations, and materiality in the context of plaintiff's claim of entitlement to rescission based on defendant's alleged breach of the land sale agreement. We do so because our analysis in that context will largely be dispositive of plaintiff's other asserted grounds for entitlement to rescissionary relief, including recovery of rescissionary damages.

> "Where a person makes a false representation of a material fact, and the person to whom the representation is made is induced to and does rely on that representation in entering into an agreement, 'that is sufficient for the purpose of avoiding the contract, irrespective of the intent and purpose of the person making the false representation.' "

*Graves v. Tulleners*, 205 Or App 267, 276-77, 134 P3d 990 (2006) (quoting *Kim v. Allstate Ins. Co.*, 102 Or App 529, 533, 795 P2d 582, *rev den*, 310 Or 475 (1990)).

■ As noted, the trial court determined that defendant "made no innocent or knowing misrepresentation of fact." On *de novo* review of the evidence adduced at trial, we disagree. In particular, plaintiff presented persuasive evidence that defendant made a false representation of fact by making the warranties in the sales agreement that, to the best of his knowledge, the property was materially in compliance with applicable state and federal environmental standards and requirements.

We further, and alternatively, find that plaintiff presented persuasive evidence that defendant falsely warranted that he had not received any notices of violation or advisory action by regulatory agencies regarding environmental control matters with respect to the property. The evidence in the record clearly establishes that defendant had received notices from both DSL and the Corps that his wetlands activities had violated the federal Clean Water Act and the state

Removal-Fill Law. Moreover, defendant was party to a consent order by which he agreed to restore the wetlands and either to submit a permit application that included a mitigation plan or, if such an application was not submitted by October 10, 2003, to provide a restoration plan. Because defendant had not submitted either a permit application or a restoration plan by October 10, 2003, plaintiff persuasively established that, at the time defendant offered to sell the property to plaintiff and made the operative warranties, he knew that he was in violation of the consent order, knew that the wetland restoration issue had not been resolved, and knew that he was subject to a $10,000 penalty for failing to meet the restoration measures set forth in the consent order.[19]

 The question remains, however, whether the misrepresentations constituting the breach were so "material" or "substantial" as to entitle plaintiff to the remedy of rescission. "Whether a contractual breach is material is a question of fact." *Burgess v. North Bend School Dist. #13*, 216 Or App 510, 514, 173 P3d 1271 (2007) (citing *Wasserburger v. Amer. Sci. Chem.*, 267 Or 77, 82, 514 P2d 1097 (1973)). We assess that materiality according to the following criteria:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

---

[19] Our analysis in this regard is unaffected by whether defendant had received the DSL notice that it intended to collect the penalty pursuant to the consent order at the time he negotiated with plaintiff in January 2004. Defendant's knowledge of DSL's intent to enforce the penalty would merely exacerbate the misrepresentation; any lack of such notice on defendant's part would not alleviate the actionable misrepresentation.

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Burgess*, 216 Or App at 515 (quoting *Pollock v. D. R. Horton, Inc. - Portland*, 190 Or App 1, 17, 77 P3d 1120 (2003) (adopted from *Restatement (Second) Contracts* § 241)).

On *de novo* review, in light of the evidence concerning the first of those factors, we find that plaintiff's evidence established that it reasonably expected, when it entered into the agreement with defendant for "entitled lots," that: (1) there had been no environmental violations on the property; (2) there were no current environmental issues concerning the property that would delay the permitting process; (3) the wetlands delineation on which DSL's concurrence was based was accurate; (4) the development would be able to proceed in the form shown by the preliminary plat that was attached as an exhibit to the agreement; and (5) the development would be able to proceed under the tight time lines that plaintiff anticipated. Defendant's misrepresentations directly affected—that is, deprived plaintiff of the benefit of—the first three of those expectations, and indirectly affected the final two expectations.

*Restatement* factors (b) and (c) do not appear to weigh heavily into the equation under these circumstances, in light of the fact that the sale of the property was never consummated. That is, under these circumstances, there is no reason why plaintiff cannot be adequately compensated in the form of rescission damages. Moreover, from the perspective of defendant, as the party failing to perform, there is no forfeiture: Although the rescission remedy would require him to return plaintiff's earnest money, he continued to enjoy the benefits of his property at all times.

As to factor (d), the likelihood that the party failing to perform would cure the failure, taking into account circumstances and reasonable assurances, we conclude that that factor weighs in favor of deeming defendant's breaching conduct—the misrepresentations by defendant concerning the wetlands described above—to have been material. Here, the operative breaches concerned not just failure to disclose information, but affirmative misinformation contained in

specific warranties in the contract, that was important to plaintiff's expectations of what could be done with the property, and when it could be accomplished. When plaintiff discovered defendant's failure to disclose the information and affirmative misrepresentation, and so advised defendant, defendant not only failed to offer reasonable assurances that he could or would cure the failure, but cut off contact with plaintiff completely.

Finally, we look to the extent to which defendant's behavior comports with standards of good faith and fair dealing. As noted above, we have found that plaintiff presented persuasive evidence that, at the time defendant made the warranties concerning environmental issues concerning the property or lack thereof, he had actual knowledge that there were ongoing, unremedied issues concerning the wetlands on the property. We bear in mind that, given the procedural posture, defendant has not presented his case here; it is possible that defendant could offer persuasive evidence that the misrepresentations were negligent rather than intentional. Nonetheless, we find that plaintiff's as-yet unrebutted evidence establishes a course of conduct by defendant that was highly suggestive of a lack of good faith.

On balance, considering the totality of the *Restatement* factors, plaintiff's evidence established that defendant's misrepresentations effected a material breach of contract.

Finally, and in a related sense, we reject the trial court's alternative determination that plaintiff could not obtain rescission because it had "assumed the risk" concerning the wetlands on the property. The doctrine of assumption of risk is premised on the notion that if a risk " 'was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed.' " *Smith Tug v. Columbia-Pac. Towing*, 250 Or 612, 643, 443 P2d 205 (1968) (quoting *Lloyd v. Murphy*, 25 Cal 2d 48, 54, 153 P2d 47 (1944)). Here, our analysis and disposition rest on the determination that defendant made material misrepresentations with regard to certain specific warranties in the contract. In light of defendant's explicit warranties concerning the wetlands contained in the contract, it is not possible to conclude that plaintiff

bore the risk that the wetlands were not as represented by defendant in those warranties. Accordingly, assumption of risk is inapposite.

In sum, we conclude that the trial court erred in granting defendant's ORCP 54 B(2) motion to dismiss plaintiff's claim for breach of contract, seeking rescissionary remedies. The trial court's dismissal of the remaining claims do not require extended discussion. As noted above, those theories (intentional misrepresentation, innocent misrepresentation, and mutual mistake) involve variations that are dependent, for the most part, on the state of mind of defendant when he made misrepresentations concerning the wetlands in the sales agreement. Because the trial court's dismissal of those claims appears to have been premised on the same conclusion discussed above—that defendant made no misrepresentation or that any misrepresentation was not material—we conclude that the trial court erred in granting defendant's motion to dismiss those claims as well pursuant to ORCP 54 B(2).

We return, in the end, to *Castro*. With due respect, this case exemplifies why ORCP 54 B(2) should be invoked, and employed, only "sparingly," especially in equity cases. *Castro*, 51 Or App at 713. The dynamics of *de novo* review present the very substantial risk that a half-tried case will be remanded for a new trial because our assessment of the persuasiveness of a plaintiff's proof varies from the trial court's. That risk was realized here.

## III. CONCLUSION

The trial court erred in granting defendant's ORCP 21 E and ORCP 21 A(8) motions against plaintiff's breach of contract claim seeking consequential damages for breach. The trial court also erred in granting defendant's motion under ORCP 54 B(2) to dismiss plaintiff's remaining claims at trial.

Reversed and remanded.