Argued and submitted December 1, 2008, on appeal, general judgment reversed and remanded, supplemental judgment vacated; cross-appeal dismissed as moot August 12, 2009

## RIVERSIDE HOMES, INC.,
an Oregon corporation,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

## Linda Lapp MURRAY
and Irene E. West,
*Defendants-Respondents*
*Cross-Appellants.*

Washington County Circuit Court
C053944CV; A135387

214 P3d 835

Thomas M. Christ argued the cause for appellant - cross-respondent. With him on the briefs were Julie A. Smith and Cosgrave Vergeer Kester LLP.

William E. Gaar argued the cause for respondents - cross-appellants. With him on the briefs were Michelle E. Lentzner and Buckley LeChevallier P.C.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Wollheim, Judge.

ARMSTRONG, J.

Edmonds, P. J., dissenting.

## ARMSTRONG, J.

Plaintiff brought this action against defendants seeking specific performance of a land sale contract. At the close of plaintiff's case-in-chief, the trial court granted defendants' motion for judgment of dismissal with prejudice pursuant to ORCP 54 B(2), but awarded plaintiff $136,024.66 as reimbursement for development costs expended by plaintiff during the pendency of the sale of the land. In a supplemental judgment, the court further determined that defendants, as the prevailing parties, were entitled to an award of attorney fees, costs, and disbursements in the amount of $72,427.61, and denied plaintiff's request for fees. Plaintiff appeals, arguing that the trial court erred in (1) granting defendants' motion for dismissal; and (2) awarding attorney fees to defendants and denying plaintiff its fees. Defendants cross-appeal that portion of the judgment awarding plaintiff reimbursement of its development costs. On appeal, we reverse and remand the judgment of dismissal and, consequently, vacate the supplemental judgment awarding defendants their attorney fees and costs. We dismiss defendants' cross-appeal as moot.

The following facts are undisputed. On November 12, 2003, plaintiff entered into a contract with defendants to purchase four and one-half acres of undeveloped land owned by defendants in Hillsboro. Plaintiff intended to develop the property into a subdivision of homes. The purchase price was $1,000,000. The contract required plaintiff to deposit $35,000 in earnest money; it further provided that the agreement was subject to plaintiff completing, within 45 days, a feasibility study for the development of the property. If plaintiff determined that it would be "economically viable" and "architecturally feasible" to develop the property as it intended, it would remove the feasibility contingency and release the earnest money; otherwise, the transaction would be "null and void" and the deposited earnest money was to be returned to plaintiff. The agreement also contained a "time is of the essence" clause, stating that it "shall apply to all terms and conditions of this Agreement."

Paragraph 6 of the contract contained the parties' agreement with respect to closing. As originally drafted, it

provided that the transaction would close within six months of the earnest money deposit; it also allowed plaintiff to purchase up to six one-month extensions of the closing date for a fee of $5,000 each. Paragraph 6 further stated that, in the event of an appeal of the preliminary plat for the subdivision, the six-month deadline for closing and other deadlines would be extended. Finally, it reserved plaintiff's right to waive all contingencies and close the transaction.

During the feasibility study, plaintiff discovered that a portion of the property was zoned industrial rather than residential and, therefore, that an amendment to the City of Hillsboro's comprehensive plan was required before the property could be developed. As a result, the parties eventually agreed to revised Addendum A, dated December 8, 2003, which amended paragraph 6 to require that the transaction close within six months of notification by the city of the zoning change.

Plaintiff also learned that the city would allow access to the property only through a neighboring subdivision; as a result, plaintiff would be unable to develop the property until the developer of that subdivision improved and dedicated a connector street. Consequently, plaintiff proposed another change to the contract and, after further negotiation, the parties agreed to Addendum B, dated January 27, 2004. Paragraphs 2 and 3 of Addendum B provided:

"2. The following is hereby added to [paragraph ] 6 of the Agreement:

"The Closing of this transaction is contingent upon dedication of a future improved and dedicated street connection at the southeast corner of the property from the adjacent subdivision known as the 'Roses Subdivision.[']

"3. The second sentence of [paragraph ] 6 of the Agreement [allowing plaintiff to purchase six one-month extensions of the closing date] is hereby deleted and replaced with the following:

"In the event that Buyer has not received final engineering approval from the City of Hillsboro by December 29, 2004, Buyer may exercise up to ten (10) one month extensions of the closing date, for a monthly extension fee of $10,000.00[,] which shall be paid prior to each month, half

of which ($5,000.00) shall be applied towards the purchase price at closing."[1]

Thus, the parties agree that the final language of paragraph 6, as modified by addenda A and B, provides:

"6. CLOSING - This transaction shall close within Six (6) months of notification by City of Hillsboro that the entire property is zoned residential. In the event that Buyer has not received final engineering approval from the City of Hillsboro by December 29, 2004, Buyer may exercise up to ten (10) one month extensions of the closing date, for a monthly extension fee of $10,000.00[,] which shall be paid prior to each month, half of which ($5,000.00) shall be applied towards the purchase price at closing. In the event that the preliminary plat is appealed, all closing dates, Earnest Money payment dates, and Extension dates and payments shall be extended an equal amount of time from the date of the appeal to the date which preliminary plat approval is granted and all appeals having been resolved and all appeal periods having expired, whichever is later. The Closing of this transaction shall take place at Escrow. Buyer reserves the right to close this transaction and waive all contingencies at any time if, in Buyer's sole discretion, this action is warranted. The closing of this transaction is contingent upon dedication of a future improved and dedicated street connection at the southeast corner of the property from the adjacent subdivision known as the 'Roses Subdivision.' "

The city subsequently approved plaintiff's application for a comprehensive plan amendment. However, because plaintiff's engineering plans had not yet been approved on December 29, 2004, plaintiff began exercising its option to extend the closing date. Plaintiff eventually exercised all 10 monthly extensions, paying defendants a total of $100,000. On October 18, 2005, defendants notified plaintiff that the last of the monthly extensions would be exhausted on October 29, 2005, and that, if closing did not take place on or

---

[1] Addendum B also removed the feasibility contingency, required plaintiff to submit its application for a comprehensive plan amendment not later than February 20, 2004, required plaintiff to notify defendants by December 1, 2004, if it planned to use closing extensions, and provided that the earnest money was to be deposited within five days of the date of the addendum and that the earnest money and all extension payments were nonrefundable, except in the event of seller default.

before that date, plaintiff "will be considered to be in default and this transaction will be terminated." At that time, the connector street had not been dedicated, and plaintiff declined to close.

Plaintiff then brought this action for specific performance of the contract, asserting that the street dedication contingency had not been satisfied and requesting judgment directing defendants to convey the property on the terms set forth in the agreement and awarding plaintiff "such further relief [as] the Court deems just and proper." Several months later, on June 16, 2006, plaintiff notified defendants that it was waiving the street dedication contingency and requested that defendants complete the necessary documents to close the transaction.

The case was tried to the court. At trial, plaintiff argued that defendants breached the contract by unilaterally terminating it prior to the event—satisfaction or waiver of the street dedication contingency—upon which closing of the sale was predicated. In addition to evidence of the facts recounted above, plaintiff presented testimony from Wagoner, its land acquisitions manager. Referring to the street dedication contingency reflected in paragraph 2 of Addendum B, Wagoner testified that "we inserted this language and basically wanted to make it clear that closing cannot occur until we have the ability to develop the property, which is out of our control." He further explained that plaintiff also sought the change reflected in paragraph 3, allowing it to purchase extensions for closing,[2] because

> "[i]t's preferable for Riverside our—when we can, we would choose to typically pay some additional monies to extend the closing date to get as close to final engineering approval on the property. So we were proposing to insert more time at our discretion, assuming we didn't have final engineering approval, where we could pay a monthly payment to the sellers to extend the closing date."

---

[2] As originally proposed by plaintiff, paragraph 3 gave plaintiff the option, if final engineering approval had not been received by the "closing date," to exercise up to 10 monthly extensions for a monthly fee of $5,000, which was to be applied to the purchase price at closing. Defendants responded with a counteroffer, and the parties eventually agreed to the language set forth in Addendum B, *see* 230 Or App at 295-96.

Wagoner testified that the purpose of Addendum B was therefore to establish two different and independent closing scenarios—one tied to the dedication of the street (paragraph 2) and the other allowing plaintiff to purchase additional time for closing in the event that the street was dedicated but plaintiff had not yet received final engineering approval (paragraph 3). A meeting was held on January 27, 2004, to discuss Addendum B with defendants and their real estate agent. Wagoner testified that he presented defendants with Addendum B at that meeting and went over each provision of it. He testified that he explained to defendants that paragraphs 2 and 3 represented different closing scenarios and that the latter "was intended to allow more time in the event that the road for some reason was brought in right away, then we wanted to have the ability to purchase additional time to get down the entitlement process." Wagoner testified that, in response to defendants' questions about when the street would be built, he told them "my best guess is that it would be one to three years, but that's a completely—just a guess, it depended on what [the other developer] was deciding to do," and that "[i]t was my hope that it would happen by the end of '05." At the end of the meeting, defendants signed Addendum B.

Plaintiff also presented testimony from Weichbrodt, another Riverside employee, and Albro, Riverside's real estate agent, both of whom were present at the January 27 meeting. Their testimony confirmed Wagoner's account of the meeting. Albro testified that Wagoner explained to defendants and their real estate agent at the meeting that, under paragraphs 2 and 3 of Addendum B, "[i]f the buyer had received final engineering approval prior to the road being dedicated, that we still did not have a closing until that dedication, that the closing was based on the event of the road being there for them to have access," but that "[i]f it occurred prior to, then once the final engineering had been approved by the city, they were ready to close." Defendants did not ask for any changes to Addendum B in response to that explanation.

At the close of plaintiff's evidence, defendants moved to dismiss the case.[3] Defendants argued that the contract

---

[3] To be accurate, defendants actually moved for a directed verdict, which, because the case was tried to the court, the court properly characterized as a

lapsed on October 29, 2005, when the last of the extensions expired, and, consequently, plaintiff was not entitled to specific performance because it had failed to prove the existence of a valid contract to enforce. Plaintiff responded that the contract remained in effect beyond October 29, because it was not obligated to close the sale until the street connector contingency was satisfied or waived, a event that did not occur until June 16, 2006, when it attempted to perform under the contract.

The court agreed with defendants and granted the motion to dismiss. The court found that plaintiff's witnesses "testified honestly, I didn't ever dispute that, and I also believe that is their sincere belief that that is what they were trying to accommodate." But, the court continued,

"I have to be able to find that a reasonable and rational finder of fact, whether it be a Court or a jury, would then be able to find that the subject language that we've all been referring to, and/or the parties' intent, gave [plaintiff] what it says that it has, which is * * * that not only did they have the right to continue the opportunity to purchase by exercising and then paying for the extension of the closing date, and that's recited in * * * [paragraph] number three of Addendum B, but that they also, after the extensions—or before, but after the extensions lapsed had an indefinite and potentially permanent right to keep the sale pending[.]

"* * * * *

"What that language is there for, it is standard language, [paragraph] number two does not refer to a date, it's simply putting [plaintiff] in a position that all the way up through that period of time of the extensions, even at the last minute they can say, 'Well, you know, it's not worth the risk. Business is a calculated risk and we thought that they were going to make the road, we think they probably still

_____

motion for dismissal with prejudice under ORCP 54 B(2). *See Federal Deposit Ins. Corp. v. Tempest Fugat*, 75 Or App 536, 541, 707 P2d 81 (1985), *rev den*, 300 Or 546 (1986) (in a case tried to the court, "[d]efendants' motion for a 'partial directed verdict' at the close of plaintiff's case amounts to a 'partial' motion for involuntary dismissal under ORCP [54 B(2)]"). Apparently, the parties and the trial court were also somewhat confused about the standard governing motions for dismissal under ORCP 54 B(2). That confusion is understandable, *see Venture Properties, Inc. v. Parker*, 223 Or App 321, 333-41, 195 P3d 470 (2008) (recognizing and clarifying inconsistencies in case law surrounding that question); in any event, it does not affect our task on appeal.

will, but since they haven't done it yet, we're not willing to plunk down another big chunk of change and make the bet.'

"But this contract, then, you cannot just say, 'Hey, you know, this is going to wait forever.' You've got to fish or cut bait at some point, and there was nothing in there to allow the circle to be closed to allow this to make sense.

"So the sellers aren't required to wait for an unknown date without compensation, without any other remedy, and because of that I don't find that a reasonable and rational trier of fact could ultimately conclude that the contract survived October 29th, 2005[.]"

The court further determined that defendants were entitled under the contract to retain the earnest money and extension payments ($135,000) made by plaintiff, but, under equitable principles, ordered defendants to pay plaintiff the sum of $136,024.66 "as reimbursement for costs expended by [p]laintiff on behalf of the [p]roperty." Both parties requested attorney fees; in a supplemental judgment, the court granted defendants' request and denied plaintiff's, awarding defendants $72,427.61 in attorney fees, costs, and disbursements.

On appeal, plaintiff assigns error to the trial court's dismissal of the case under ORCP 54 B(2) and its award of attorney fees to defendants. Defendants cross-appeal, assigning error to the court's award of $136,024.66 to plaintiff as reimbursement for its development costs.

We begin with plaintiff's challenge to the trial court's grant of defendants' motion to dismiss plaintiff's claim under ORCP 54 B(2).[4] As we recently clarified in *Venture Properties, Inc. v. Parker*, 223 Or App 321, 340-41, 195 P3d 470 (2008), a trial court may grant a motion to dismiss under ORCP 54 B(2) if, viewing the evidence in the light most favorable to the

---

[4] ORCP 54 B(2) provides:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment of dismissal with prejudice against the plaintiff, the court shall make findings as provided in Rule 62."

plaintiff, the plaintiff failed to present a *prima facie* case, or, even if the plaintiff has presented a *prima facie* case, the court, as trier of fact, is unpersuaded by the plaintiff's evidence.[5] However, as we emphasized, "the power of dismissal under ORCP 54 B(2) should be employed 'sparingly'— especially in cases involving equitable claims—to avoid unnecessary remands for new trials." *Id.* at 341 (citing *Castro and Castro*, 51 Or App 707, 713, 626 P2d 950 (1981)). On appeal of the trial court's ORCP 54 B(2) dismissal of an equitable claim, such as plaintiff's claim for specific performance in this case, we review the record *de novo*, ORS 19.415(3) (2007),[6] giving "considerable weight" to the credibility determinations made by the trial court. *Venture Properties, Inc.,* 223 Or App at 341.

 "To prevail [on a claim for specific performance,] a plaintiff must show that it has a valid, legally enforceable contract and that it is ready, willing, and able to perform its obligations under the contract." *View Point Terrace LLC v. McElroy*, 213 Or App 281, 285, 160 P3d 1023, *rev den*, 343 Or 691 (2007). Generally, a claim for specific performance must be proved by clear and convincing evidence. *Murray v. Laugsand*, 179 Or App 291, 294, 39 P3d 241 (2002). The parties do not dispute that plaintiff was ready, willing, and able to perform under the contract. Thus, the dispositive issue is whether plaintiff persuasively demonstrated—pending the presentation of any contrary evidence by defendants—the existence of "a valid, legally enforceable contract." If, as the trial court determined, the evidence demonstrated that the contract terminated on October 29, 2005, when the last of the extensions expired without plaintiff having waived the contingency and closed the sale, then plaintiff failed to meet its burden. On the other hand, if plaintiff's evidence persuasively established that closing was not required under the contract until the street dedication contingency was satisfied, then the trial court erred in dismissing the case.

---

[5] *Venture Properties, Inc.,* was decided after this case was tried and after the parties had submitted their briefs on appeal.

[6] ORS 19.415 was recently amended by Senate Bill (SB) 262 (2009). Or Laws 2009, ch 231, §§ 2-3. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, we apply the 2007 version of ORS 19.415.

In interpreting a contractual provision, a court first examines the text of the disputed provision in the context of the document as a whole, and determines, as a matter of law, whether the provision is ambiguous. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). The court may consider extrinsic evidence of "the circumstances underlying the formation of the contract" in making this determination. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317, 129 P3d 773, *rev den*, 341 Or 366 (2006). If, after this first step, the contractual provision is clear, the analysis ends. *Yogman*, 325 Or at 361. If it remains ambiguous, the court then examines extrinsic evidence of the contracting parties' intent. *Id.* at 363. Finally, if those two analytical steps have not allowed the court to resolve the ambiguity, the court applies appropriate maxims of contract construction to determine the parties' intent. *Id.* at 364.

In this case, the trial court expressly found that plaintiff's witnesses were credible, that is, the court believed those witnesses' testimony that plaintiff understood—and had communicated to defendants—that Addendum B of the contract gave it the ability to keep the sale pending until such time as the street dedication contingency was waived or satisfied. Yet, notwithstanding that finding, the court concluded that the language of the contract was not susceptible to such an understanding. Thus, we understand the court to have determined, at the first level of analysis, that the contract unambiguously terminated when closing did not occur by October 29, 2005—and, therefore, the court did not consider extrinsic evidence of the contracting parties' intent. *Yogman*, 325 Or at 361.[7]

Central to the parties' dispute is the meaning of the clause added to the contract by paragraph 2 of Addendum B. Again, that provision states, "The Closing of this transaction is contingent upon dedication of a future improved and dedicated street connection at the southeast corner of the property from the adjacent subdivision known as the 'Roses

---

[7] Although in ruling on the motion, the court mentioned the intent of the parties, the only logical reading of the court's decision, given its express findings of credibility regarding plaintiff's intent, is that it concluded that the language of the contract was unambiguous.

Subdivision.' " Defendants contend that the trial court correctly construed that provision, in the context of the contract as a whole, to mean that plaintiff would be relieved of its obligation to proceed with the sale if, on the date established for closing, the contingency had not been satisfied. As support for that position, defendants point to the other provisions of paragraph 6 of the contract, particularly the following:

> "This transaction *shall close* within Six (6) months of notification by City of Hillsboro that the entire property is zoned residential. In the event that Buyer has not received final engineering approval from the City of Hillsboro by December 29, 2004, Buyer may exercise up to ten (10) one-month extensions of *the closing date*, for a monthly extension fee of $10,000.00[,] which shall be paid prior to each month, half of which ($5,000.00) shall be applied towards the purchase price at closing."

(Emphasis added.)

In defendants' view, those provisions unambiguously establish that the contract was required to close—at the latest—upon expiration of the 10 one-month extensions, that is, by October 29, 2005. Given the requirement that defendants be paid for any extensions beyond the originally contemplated closing date, reading paragraph 2 to give plaintiff an open-ended right to keep the sale pending without payment would, according to defendants, be illogical. Additionally, defendants point to paragraph 15(b) of the contract, which states, in part, "In the event Buyer fails, without legal excuse, to complete the purchase of the Property, any Earnest Money deposit(s) paid to [defendant] shall be forfeited to the Seller as the sole and exclusive remedy available to the Seller for such failure," and to the "time is of the essence" clause. When properly viewed in the context of those provisions, defendants contend, the street dedication contingency of paragraph 2 can be construed *only* as allowing plaintiff to walk away from the sale (losing only its earnest money) and not as a mechanism by which plaintiff could indefinitely delay the closing date.

Although we agree with defendants that the trial court's interpretation of the contract was, for the reasons they advance, a reasonable one, we are not persuaded that

the court's construction is the only reasonable one. First, as plaintiff emphasizes, the contract does not explicitly state that the contract will terminate at the conclusion of the extensions if it has not yet closed. Nor does it state that the transaction will terminate if it does not close by a particular date. Moreover, paragraph 2 of Addendum B, on its face, refers to the *closing* (not the sale) and conditions *that event* on the improvement and dedication of the street. When considered in conjunction with the provision giving plaintiff, in its sole discretion, *"the right to close* this transaction and waive all contingencies *at any time,"* plaintiff's interpretation of the contract—that is, that its right to *close* the transaction continued, even after October 29, 2005, until the connector street contingency had been satisfied or waived—is at least plausible. Further, contrary to defendants' contention, that construction is not defeated by the provision allowing plaintiff to purchase extensions of the closing date. Rather, we agree with plaintiff that that provision can reasonably be understood, in light of the other provisions of the contract discussed above, as establishing a separate and independent closing scenario—one that would apply if the street has been dedicated, but final engineering approval were still lacking.

In short, based on a contextual reading, both plaintiff's and defendants' proposed constructions of the contract are plausible; accordingly, we conclude that the contract is ambiguous as to its closing terms, and the trial court erred in concluding otherwise.[8] *Batzer Construction,* 204 Or App at 317 (A term in a contract is ambiguous if, when examined in the context of the contract as a whole, including the circumstances in which the agreement was made, it is susceptible to more than one plausible interpretation.); *Deerfield Commodities v. Nerco, Inc.,* 72 Or App 305, 317, 696 P2d 1096, *rev den,* 299 Or 314 (1985) ("A contract provision is ambiguous if * * * it is capable of more than one sensible and

---

[8] In assessing whether an ambiguity exists in the terms of an agreement, a court may consider extrinsic evidence of the parties' intent that is limited to the circumstances under which the agreement is made. *City of Eugene v. Monaco,* 171 Or App 681, 687, 17 P3d 544 (2000), *rev den,* 332 Or 240 (2001); *see also* ORS 42.220. Here, neither party argues that the circumstances surrounding the contract's formation resolve the ambiguity in its favor.

reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person.").

The dissent disagrees, concluding that paragraph 2 of Addendum B can only be read to "discharge a previously stated obligation of the parties to purchase and sell the property in the event the contingency does not occur." 230 Or App at 315 (Edmonds, P. J., dissenting). As the dissent frames it, the issue is "whether [the language of paragraph 2] constitutes a contingency or condition precedent to the obligations to consummate the property sale or whether it constitutes a promise to extend the closing date agreed to in paragraph 3." 230 Or App at 313 (Edmonds, P. J., dissenting). There are several problems with the dissent's reasoning. First, it assumes that the parties unambiguously agreed to an ultimate closing date for the sale—that is, that the "previously stated obligation" of the parties to purchase and sell the property included an agreement that the transaction would indisputably close by a specific date—that is, at the end of the 10-month extension period specified in paragraph 3. However, that thesis is fatally undermined by the agreement itself. Specifically, both as originally written and as revised by the addendums, the third sentence of paragraph 6 provides for an extension of all "closing dates, Earnest Money payment dates, and Extension dates and payments" in the event that the preliminary plat is appealed. As with paragraph 2, that provision also contemplates the possibility of an indeterminate closing date. That is, under that provision, even at the end of the 10-month extension period, closing would not occur if the preliminary plat were appealed and the appeal process not completed by that time. Thus, it is at least plausible that—as plaintiff asserts and we agree—paragraph 2 operates similarly.

Next, the dissent asserts that the alternative construction posed by plaintiff requires us to add words to paragraph 2 in violation of ORS 42.230 ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]"). 230 Or App at 316-17 (Edmonds, P. J., dissenting). We disagree. To the contrary, the dissent fails to recognize that the parties expressly agreed that the "*closing*"—not

the "obligation to perform," or the "sale," or the "contract," or the "offer," or the "transaction," or any number of other ways the parties might have chosen to express their agreement that performance, rather than the specific event of closing—hinged on the street dedication.

In that sense, this case is markedly distinguishable from the cases cited by the dissent for the proposition that paragraph 2 can be understood only as establishing a condition precedent. *Phoenix-Talent School Dist. v. Hamilton*, 229 Or App 67, 210 P3d 908 (2009), upon which the dissent heavily relies, is a good example. In *Phoenix-Talent*, we held that a provision in the parties' agreement requiring the satisfaction of certain conditions, including obtaining a lot line adjustment, "according to its terms," constituted a condition precedent terminating the sellers' obligation to perform, rather than a promise that the buyer could waive. However, as the dissent recognizes, in that case we noted that the relevant provision of the agreement stated that the buyer's "*obligation to purchase* the property" was contingent on the conditions being satisfied before closing. *Id.* at 75 (emphasis added). Here, the parties, at least plausibly, intended something different by referring more narrowly to the closing itself. Indeed, in contrast, the original feasibility contingency of the contract provided that the "agreement" was subject to plaintiff's completion of a feasibility study and, significantly, that if plaintiff elected not to proceed following that study, then the "transaction" would be "null and void." Thus, the parties knew how to express the concept of a condition precedent if that is what they unambiguously intended.

In sum, we do not dispute that defendants' proposed construction of paragraph 2 is a reasonable one—even, perhaps, the *more* reasonable one. Where we part ways with the dissent is in its insistence that that construction is the *only* plausible one. In other words, we cannot agree that the meaning of paragraph 2, considered in the context of the agreement as a whole, "is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities*, 72 Or App at 317. Rather, we conclude that it is also fairly susceptible of the meaning plaintiff ascribes to it—that, by expressly agreeing that the closing was contingent upon dedication of the

street, the parties plausibly intended to delay that event until the street was dedicated, regardless of the expiration of the extension period related to engineering approval, just as they had agreed to do with respect to a possible appeal of the preliminary plat. As a result, we conclude that the contract is ambiguous.

■ We thus proceed to the second analytical step in contract interpretation: examining the extrinsic evidence of the contracting parties' intent. *Yogman*, 325 Or at 363.

Plaintiff's manager, Wagoner, testified that, by adding paragraph 2, "we * * * basically wanted to make it clear that closing cannot occur until we have the ability to develop the property, which is out of our control." He also testified that paragraph 3 was designed to establish an independent closing scenario in the event the street was dedicated, but they had not yet received final engineering approval, and that he had explained both provisions to defendants at the January 27, 2004, meeting. Weichbrodt's and Albro's testimony corroborated Wagoner's account of the meeting; further, both Albro and Wagoner testified that defendants did not ask for any changes to Addendum B before signing it at the meeting.

Although we have *de novo* review of the record, as noted, we give "considerable weight" to the credibility determinations of the trial court. *Venture Properties, Inc.*, 223 Or App at 341. Here, the trial court expressly found that plaintiff's witnesses testified honestly; after reviewing the record, we see no reason to disturb that finding. Given that deference, the testimony described above is credible evidence that the parties intended to delay closing until the street dedication contingency was satisfied or waived by plaintiff; in other words, it resolves the ambiguity in plaintiff's favor. Thus, at this point in the proceedings—that is, pending controversion by defendants' evidence—we conclude that plaintiff has persuasively established the existence of a valid, legally enforceable contract.[9]

---

[9] Because of our resolution of plaintiff's first assignment of error, we necessarily also reject defendants' argument that we should affirm the judgment of the trial court on the alternative basis that the contract is too indefinite to be specifically

Because it is undisputed that plaintiff was ready, willing, and able to perform the contract, it follows that plaintiff has established a *prima facie* claim for specific performance sufficient to withstand a motion to dismiss under ORCP 54 B(2). Accordingly, on appeal, we reverse and remand the general judgment dismissing plaintiff's case and awarding plaintiff reimbursement for its costs. Consequently, we also dismiss plaintiff's cross-appeal as moot. Finally, we vacate the supplemental judgment awarding attorney fees and costs to defendants.

On appeal, general judgment reversed and remanded, supplemental judgment vacated; cross-appeal dismissed as moot.

**EDMONDS, P. J.,** dissenting.

The majority holds that the trial court erred by granting defendants' motion for involuntary dismissal of plaintiff's complaint for specific performance under ORCP 54 B(2). It reasons that the parties' agreement regarding when closing is to occur is ambiguous and that extrinsic evidence offered by plaintiff at trial supports a reasonable interpretation of the agreement that the time of the closing of the transaction was intended to be indefinite and based on a future contingency. I disagree that the agreement is subject to more than one reasonable interpretation and that extrinsic evidence was admissible to prove the parties' intention. I would also reach defendants' cross-appeal and would reverse the trial court's judgment awarding plaintiff damages for unjust enrichment. Accordingly, I dissent for the reasons expressed more fully below.

The threshold issue is whether the trial court erred in granting defendants' motion for judgment of dismissal under ORCP 54 B(2). That rule authorizes a trial court in a nonjury proceeding to enter a judgment of dismissal based on the insufficiency of the evidence at the close of the plaintiff's case. For purposes of this case, the controlling issue is

---

enforced. We emphasize again, however, that defendants have yet to present their case.

whether the parties' agreement is ambiguous, a determination that is made as a matter of law. *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997).

At trial, plaintiff offered evidence that, on November 12, 2003, it entered into an agreement with defendants to purchase undeveloped land owned by defendants. Paragraph 6 of the original agreement provided that the transaction would close within six months of the earnest money deposit but allowed plaintiff to purchase up to six one-month extensions of the closing date for a fee of $5,000 per extension.

After the initial agreement was signed, plaintiff undertook a feasibility study for the development of the property and learned that a zone change would be necessary as well as the dedication of access to the property through a neighboring subdivision. Accordingly, the parties entered into Addendum A to the agreement on December 8, 2003. It provides:

> "Sellers understand that property currently has 2 different zonings and may have to go through a comprehensive plan amendment to remove industrial zoning prior to submission of any land use or zone change applications. Therefore, the first sentence of paragraph 6 of purchase and sale agreement is to be changed to:

> "This transaction shall close within six (6) months of notification by City of Hillsboro that the entire property is zoned residential.

> "All other terms and conditions to remain the same."

After Addendum A was executed, the parties entered into further negotiations regarding modification of paragraph 6 of the original agreement. On January 27, 2004, the parties executed Addendum B to the original agreement which again modified paragraph 6 as well as other provisions of the agreement. In its entirety, Addendum B provides:

> "This addendum contains additional terms and conditions of sale. If the terms and conditions of sale conflict with or vary from the terms contained in the Agreement, the terms contained in this Addendum B shall govern.

"Buyer hereby removes the feasibility contingency contained in paragraph 4 of the Agreement subject to Seller's agreement to the following:

"1. The legal description for the subject property is correctly shown on the attached Exhibit 'A' * * *.

"2. The following is hereby added to paragraph 6 of the Agreement:

"The Closing of this transaction is contingent upon dedication of a future improved and dedicated street connection at the southeast corner of the property from the adjacent subdivision known as the 'Roses Subdivision.[']

"3. The second sentence of paragraph 6 of the Agreement is hereby deleted and replaced with the following:

"In the event that Buyer has not received final engineering approval from the City of Hillsboro by December 29, 2004, Buyer may exercise up to ten (10) one month extensions of the closing date, for a monthly extension fee of $10,000.00 which shall be paid prior to each month, half of which ($5,000.00) shall be applied towards the purchase price at closing.

"4. Buyer agrees to notify Seller on or before December 1, 2004[,] if Buyer will be using closing extensions.

"5. Earnest Money to be deposited with five business days of mutual acceptance of this addendum. Earnest Money and all extension payments to be released to Seller and become non-refundable (except in event of Seller default).

"6. Buyer to submit for comprehensive plan amendment no later than February 20, 2004.

"All other terms and conditions of the Agreement shall remain unchanged and continue in full force and effect."

In the summer of 2004, the City of Hillsboro changed its zoning requirements, eliminating plaintiff's concern that had prompted Addendum A. However, the connecting street contingency remained an issue, and, before December 2004, plaintiff notified defendants that it intended to exercise its extension rights under Addendum B. Plaintiff exercised all 10 monthly extensions. When plaintiff failed to close the transaction within the time period allotted by the agreement

for those extensions, defendants declared plaintiff in default. That declaration prompted plaintiff to file this action for specific performance of its agreement with defendants as modified by addendums A and B.

In its complaint for specific performance, plaintiff alleges that it has paid the 10 extension payments under the agreement and "has performed all conditions precedent to be performed on its part pursuant to the Sale Agreement" but that "there has not been a dedication of a future improved and dedicated street connection at the southeast corner of the Property." In plaintiff's view of the agreement, it is entitled to specific performance because the time for closing under the agreement has not yet expired and will not occur until after the dedication of the street connection.[1] Defendants counter that the agreement expired when plaintiff did not purchase the property on October 29, 2005, the date when the final extension purchased by plaintiff expired.

The majority concludes that the parties' agreement as modified by the addendums is susceptible to more than one reasonable interpretation. Consequently, it evaluates the extrinsic evidence presented by plaintiff and concludes that the evidence establishes that closing was not required under the contract until the street contingency was satisfied. It bases that conclusion on the testimony of plaintiff's witnesses that Addendum B was intended to extend the closing date until such time as the connecting street was dedicated.

Generally, in the interpretation of a contractual provision, courts follow a three-step process. First, we examine the text of the disputed provision in the context of the agreement itself. *Yogman,* 325 Or at 362-64. If the provision is clear on its face, then the analysis ends. *Id.* If the provision is susceptible to more than one reasonable interpretation after

[1] Plaintiff alleges that the street dedication contingency is clearly beyond its control because "[t]he adjacent property on which the street dedication is to occur is owned by others, under development, and awaiting final approvals from the City of Hillsboro." Generally, the remedy of specific performance of an agreement to purchase real property will not be granted unless a condition upon which performance depends has already occurred. *Deitz v. Stephenson,* 51 Or 596, 605, 95 P 803 (1908). Here, it was unnecessary for the trial court to reach that issue because it ruled that plaintiff's right to close the transaction under the parties' agreement and addendums expired as of October 29, 2005.

reading it in the context of the other provisions of the agreement, we seek to ascertain the intent of the parties by resorting to extrinsic evidence of their intent. *Id.* If the meaning of the contractual provision remains ambiguous after the first two steps of the analysis have been applied, we rely on appropriate maxims of construction to ascertain the intent of the parties. *Id.* at 364. I would hold that, when the provisions of the agreement and the addendums are read together, they are susceptible to only one reasonable interpretation in light of controlling contract interpretation principles. Accordingly, in my view, the majority improperly relies on extrinsic evidence of the parties' intent in reaching its conclusion.

The particular provision of the parties' agreement to be interpreted in this case is paragraph 2 of Addendum B, which, as set forth above, provides that "[t]he Closing of this transaction is contingent upon the dedication of a future improved and dedicated street connection at the southeast corner of the property from the adjacent subdivision known as the 'Roses Subdivision.[']"

Paragraph 4 of the agreement, to which Addendum B refers, provides that the agreement by plaintiff to purchase defendants' real property is subject to a feasibility study for the development of the property. The first sentence of paragraph 6 of the original agreement, to which Addendum B refers, provides for the closing of the transaction "within Six (6) months of the Earnest Money Deposit." Paragraph 6 was initially amended by Addendum A, which provides in pertinent part, "This transaction shall close within six (6) months of notification by City of Hillsboro that the entire property is zoned residential." Paragraph 3 of Addendum B deletes the second sentence of paragraph 6, which had provided for six one-month extensions for a monthly purchase fee of $5,000, and replaces it with a provision that allows plaintiff to purchase up to 10 one-month extensions of the closing date for $10,000 per extension. When read together as amended, the agreement and the addendums provide for closing within six months of notification by the City of Hillsboro that the entire property is zoned residential, with the right of plaintiff to extend the closing date for an additional 10-month period by paying additional consideration.

Defendants' position in this case is predicated on the legal principle that, if "a covenant in the contract for the sale of land [provides] that the time of payment shall be of the essence of the contract[, then] upon [the] failure of the vendee to comply therewith, the contract becomes null and void[.]" *Rynhart v. Welch*, 156 Or 48, 53, 65 P2d 1420 (1937). In defendants' view, paragraph 2 of Addendum B functions independently of any of the other revisions to the agreement and does not, by its terms or by implication, extend the date for closing under the agreement. When plaintiff did not close the transaction within the time contemplated by Addendum B, its right to purchase the property expired. Conversely, plaintiff asserts that paragraph 2 of Addendum B operates to extend the closing date beyond the extensions expressed in paragraph 3 of Addendum B to an indefinite date that occurs when the connecting street is dedicated. Based on my reading of the text of the relevant contractual provision in context, I conclude that defendant's understanding is the only plausible interpretation of the agreement in light of contract interpretation principles.

Again, the text of paragraph 2 of Addendum B provides that the "Closing of this transaction is contingent upon dedication of a future improved and dedicated street connection[.]" The issue is whether that language constitutes a contingency or condition precedent to the obligations to consummate the property sale or whether it constitutes a promise to extend the closing date agreed to in paragraph 3 of Addendum B, as the majority posits. To distinguish between a contingency that operates as a condition precedent to the obligation to perform a promise and a promise itself, a review of the controlling Supreme Court cases is helpful. In *Dan Bunn, Inc. v. Brown*, 285 Or 131, 142-43, 590 P2d 209 (1979), the court observed generally that "conditions precedent" are those facts that occur subsequently to the making of a valid contract that must come into existence before there is a right to performance, before there is any breach of a contract duty, and before the remedy of specific performance is available. Whether a provision constitutes a condition, the nonfulfillment of which will excuse performance of the obligations under the contract, depends on the intent of the parties as

expressed by the terms of the contract.[2] For example, the *Bunn* court noted that the words "subject to" in a contract clearly indicates intent to impose a condition precedent, which, unless the event occurs, operates to prevent specific performance of the contract.

Similarly, in *The Simms Co. v. Wolverton et al*, 232 Or 291, 297, 375 Or 87 (1962), the Supreme Court held that the provision of an earnest money receipt, which referred to certain mortgages and provided, "Obtaining of these mortgages as specified on the sheet hereto attached is a condition of this offer. If not obtained, earnest money to be refunded," constituted a condition precedent to the promise to purchase a parcel of real property that became unenforceable when the purchaser was unable to obtain the mortgages. *See also* 81 ALR 2d 1338 (1962) (clauses making a real estate transaction contingent on financing generally "create a condition precedent to the performance of the primary contractual obligations to buy and sell the property").

In their agreement, the parties used language similar to that interpreted in *Bunn* and *Wolverton* to constitute conditions precedent rather than promises. Paragraph 2 of Addendum B provides that "[t]he Closing of this transaction is *contingent* upon dedication of a future improved and dedicated street connection." (Emphasis added.) The plain meaning of the word "contingent," as used in paragraph 2 means "dependent on, associated with, or conditioned by something else." *Webster's Third New Int'l Dictionary* 493 (unabridged ed 2002); *see also Black's Law Dictionary* 338 (8th ed 2004) ("[d]ependent on something else; conditional, ‹her acceptance of the position was contingent upon the firm's agreeing to guarantee her husband a position as well›").

In direct contrast to paragraph 2 of Addendum B, paragraph 3, which was negotiated at the same time and included in the same document, expressly operates as a promise by defendants to extend the closing date so that final engineering approval may be obtained from the City of

---

[2] Those principles are not unique to Oregon law and are universally accepted by courts in other jurisdictions. *See* Arthur L. Corbin, 3A *Corbin on Contracts* § 628, 16 (1960); *see also* Samuel Williston, 5 *Williston on Contracts* § 663 (3d ed 1957).

Hillsboro. Paragraph 2 of Addendum B does not refer to the date of closing, unlike paragraph 3 of the same document. Rather, paragraph 2 expressly refers to an event, "[t]he Closing of this transaction." The absence of any express reference to an extension of the closing date in paragraph 2 clearly demonstrates that the parties did not intend the provision to constitute a promise to extend the closing date.

Indeed, Addendum B constitutes an addendum to a previously existing set of mutually agreed promises to perform certain obligations at the time of closing. Generally, the purpose of an additional promise in an addendum is to create an obligation to be performed in the future that had not previously existed, whereas the purpose of an added contingency to an existing agreement is to discharge the obligation to perform an existing promise unless the condition occurs. Under the agreement and the addendums, plaintiff promises to purchase and defendants promise to sell the property within a specified time period. Paragraph 2 of Addendum B makes the closing of that agreement contingent on a particular event— the dedication of a street; no additional promise is embodied in its terms. Rather, the paragraph functions to discharge a previously stated obligation of the parties to purchase and sell the property in the event the contingency does not occur.[3]

Significantly, paragraph 2 does not state an obligation or duty on the part of either party for which they could be held liable for breach of contract. Until the contingency occurs, the obligations of both parties are not subject to specific performance. Rather, the time limitations for performance, found in paragraph 3 of Addendum B and in the "time of the essence clause," continued in effect. Indeed, those provisions were expressly affirmed by the parties in Addendum B to "remain unchanged and continue in full force and effect."[4]

---

[3] *See* John Edward Murray, *Murray on Contracts* § 135, 274-75 (2d ed 1974) (describing the interpretative analysis for distinguishing between promises and conditions precedent).

[4] In making its ruling, the trial court recognized the problem with plaintiff's argument. It told the parties with reference to paragraph 2,

"[I]t's simply putting Riverside in a position that all the way up through that period of time of the extensions, even at the last minute they can say, 'Well, you know, it's not worth the risk. Business is a calculated risk and we thought they

Recently, this court in *Phoenix Talent School Dist. v. Hamilton*, 229 Or App 67, 77, 210 P3d 908 (2009), decided an issue similar to the issue in this case. The parties entered into an agreement for the purchase of real property. Section 6 of the agreement was captioned "Conditions" and stated that the buyer's obligation to purchase the property "is contingent on satisfaction of each of the following conditions on or before Closing." One of the conditions involved a lot line adjustment, an event which did not occur within the time established for closing by the agreement. The issue before us was whether the contingency constituted a promise by the seller to obtain the lot line adjustment, a promise the performance of which the buyer was willing to waive, or a condition precedent that prevented the buyer from waiving the time for performance and unilaterally extending the closing date. We held that the provision, according to its terms, constituted a condition precedent that terminated the defendants' obligations to perform under the agreement. The language in paragraph 2 of Addendum B is strikingly similar to the language in the parties' agreement in *Phoenix* and should be interpreted consistently with our holding in that case.

Finally, not only is the majority's alternative interpretation unsupported by express language of the parties' agreement and therefore unreasonable, but it also runs afoul of our statutory obligation in interpreting instruments as set forth in ORS 42.230:

"In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

---

were going to make the road, we think they probably still will, but since they haven't done it yet, we're not willing to plunk down another big chunk of change and make the bet.' But this contract, then, you cannot just say, 'Hey, you know, this is going to wait forever.' You've got to fish or cut bait at some point, and there was nothing there to allow the circle to be closed to allow this to make sense. So the sellers aren't required to wait for an unknown date without compensation, without any other remedy[.]"

The majority's reasoning would add language to paragraph 2 that is not in the paragraph—language that provides that the closing is indefinitely extended until the contingency occurs.

The majority is also critical of my analysis because of the existence of another paragraph in the agreement. It points to the fact that "the third sentence of paragraph 6 provides for an extension of all 'closing dates, Earnest Money payment dates, and Extension dates and payments' *in the event that the preliminary plat is appealed.*" 230 Or App at 305 (emphasis added). But the language in that sentence demonstrates my point—that when the parties mutually contemplated an extension of the closing date because of the occurrence of a contingency, they knew how to reduce the promise to writing in their agreement. In that context, the contrast between a promise to perform in the future, *i.e.*, to extend the closing date in the event that the preliminary plat is appealed, and an addition of a contingency that must occur before the duty to close comes into effect becomes apparent.

In summary, for all of the above reasons, I would hold that, as a matter of law, the obligations of the parties under the agreement and its addendum expired by their terms when the transaction was not closed within the 10-month extension period. It necessarily follows that the trial court correctly ruled under ORCP 54 B(2) that plaintiff's evidence did not demonstrate that it was not entitled to specific performance of the parties' agreement.

Alternatively, plaintiff argues that it was entitled to waive the contingency that triggered the obligation of the parties to close the transaction and to seek specific performance because the contingency was only for its benefit. However, plaintiff filed this action for specific performance two days after the time for closing the transaction under the agreement expired on October 29, 2005. Moreover, according to the evidence, plaintiff tendered the necessary funds to close the transaction on June 16, 2005, and waived the connecting street contingency in writing at that time—long after the agreement expired by its terms. Defendants counter that, although plaintiff could have waived the contingency during the life of the agreement and requested that they close the transaction before the agreement expired, it failed to do so. In

their view, a waiver of a contractual right cannot occur after the contract is no longer in existence.

I agree with defendants' argument. A waiver is a voluntary and intentional relinquishment of a known right. *Waterway Terminals v. P.S. Lord*, 242 Or 1, 26, 406 P2d 556 (1965). A party may waive the occurrence of any condition in a contract that is for its sole benefit. *Contractors, Inc. v. Tri-Met*, 94 Or App 392, 401, 766 P2d 389 (1988), *rev den*, 307 Or 571 (1989). Here, the dedication of the connecting street was for plaintiff's benefit. Indeed, along with the zoning approval by the City of Hillsboro, it was the contingency that had to occur before plaintiff could develop the property. However, once the parties' agreement expired, there no longer existed any contractual right that could be voluntarily and intentionally relinquished by plaintiff. Based on those circumstances, I would conclude that plaintiff has not demonstrated that it had a valid, legally enforceable agreement at the time that it tendered performance and sought to waive the contingency.

Plaintiff also assigns error to the award of attorney fees to defendants. Defendants, in turn, cross-appeal the trial court's judgment awarding damages to plaintiff for unjust enrichment. In my view, resolution of the cross-appeal also controls the outcome of plaintiff's assignment of error. Plaintiff argues that it is the prevailing party and not defendants, because the trial court awarded $136,024.66 as reimbursement for the expenditure of development costs on an unjust enrichment theory. Defendants respond that the trial court lacked authority to award plaintiff damages on a theory not pleaded and, alternatively, that plaintiff failed to prove that defendants had been unjustly enriched.

In *C. A. M. Concepts, Inc. v. Gwyn*, 206 Or App 122, 127, 136 P3d 60 (2006), we held that a trial court's authority does not extend to the fashioning of remedies based on theories that are not put in issue by the pleadings. Here, plaintiff concedes that it did not specifically allege a claim for unjust enrichment. But, relying on our holding in *Oshatz v. Goltz*, 55 Or App 173, 637 P2d 628 (1981), plaintiff argues that "the complaint here 'fairly raised' the issue because it alleged that plaintiff had spent a significant amount of money on design

and engineering services for the property and because it included a prayer for general relief." In *Oshatz*, the plaintiff brought a suit in equity, seeking dissolution of an alleged oral partnership, an accounting, the appointment of a receiver, equal division of profits and losses, and general equitable relief. The complaint alleged that the plaintiff contributed cash and architectural services toward the construction of a building owed by the defendant. We held that the pleadings fairly raised the issue of recovery of the reasonable value for the plaintiff's services where there was no dispute that the plaintiff had performed extensive architectural services for the defendant and had paid certain direct costs himself. We observed that, once the claim of an oral partnership was decided against the plaintiff, there was no question that he was entitled to reasonable compensation for his services and the only question was what the amount of compensation should be. *Id.* at 180.

In contrast to the circumstances in *Oshatz*, in this case, plaintiff's complaint requested that the trial court enter judgment against defendants, directing them to proceed under the agreement "to convey the Property to plaintiff by deed on the terms set forth in the Sale Agreement upon [plaintiff's] performance of all its obligations under the Sale Agreement" and "[a]warding plaintiff such further relief the Court deems just and proper." Significantly, the complaint makes no allegations regarding, nor does it request as relief the reimbursement of, design and engineering costs. Rather, it alleges only that plaintiff has "expended approximately $75,000 on design and engineering costs," an amount that is completely different from the amount of damages ($136,024.66) awarded by the trial court. Indeed, the parties' agreement was structured in a manner that contemplated that plaintiff would make expenditures to determine if it would proceed to purchase and develop the property. That expectation is in direct contrast to the expectation of the defendant in *Oshatz* that the plaintiff would be paid for his services that contributed to the enhancement of the value of the property. For those reasons, I would hold that the trial court exceeded its authority in awarding plaintiff damages on an unjust enrichment theory that had not been pleaded,

and I would reverse the trial court's judgment awarding those damages. It would follow that defendants are the prevailing party on plaintiff's specific performance claim and are entitled to an award of attorney fees.

For all of the foregoing reasons, I dissent.